CASE 11—AGREED CASE—DECEMBER 10.


# Purnell, Etc. v. Mann, Etc.

APPEAL FROM BOURBON CIRCUIT COURT.

CONSTITUTIONAL LAW—ELECTIONS—GOEBEL ELECTION LAW.—
The Act of March 11, 1898, "An Act to Further Regulate Elec-
tions," commonly known as the Goebel Election Law, provid-
ing for the selection of county commissioners by a State com-
mission composed of three members, selected by the Legislature,
is not a violation, first, of Sec. 51 of the Constitution provid-
ing that no law enacted by the General Assembly shall relate
to more than one subject, which shall be expressed in the
title and that no law shall be revised, amended or the provis-
ions thereof extended or conferred by reference to its title, but
that so much thereof as is revised, amended, extended or con-
ferred shall be re-enacted and published at length; nor, second,
is it repugnant to Sec. 6 of the Bill of Rights declaring that all
elections should be free and equal; nor, third, is it a violation
of the principle of local self-government; nor, fourth, is it a
violation of Sec. 161 of the Constitution forbidding the change
of compensation of any city, county, town or municipal officer
during his term of office; nor, fifth, is it violation of that pro-
vision of the Constitution conferring upon the legislative de-
partment powers properly pertaining to the executive depart-
ment.

W. S. TAYLOR, ATTORNEY-GENERAL, FOR APPELLANTS.

1. What is an officer?   Bac. Abr., title "Offices and Officers," Black-
stone Com., Book 2, chap. 3, p. 36; Finch's Law, 162; 3 Kent.
Com., 454; 8 Cal. 39; U. S. v. Maurice, 2 Brook, 96; Shelby v.
Alcorn, 36 Miss., 273; Bunn v. People, 45 Ill., 397; United States
v. Hartwell, 6 Wall., 385; 20 Johns. (N. Y.), 492; People v.
Nostrand, 46 N. Y., 375; Rowland v. Mayor, 83 N. Y., 272; City
of Louisville v. Wilson, 99 Ky., 598; Mechem on Public Offices,
Sec. 1; Porter v. Pillsbury, Howard's Practice Reports, vol. 11,
p. 241; Throop on Public Officers, book 1, Secs. 1, 2, 3, 4, 5.
2. Legislative Powers.   Constitution, Secs. 27, 28, 29; Spirit of Laws,

Book 11, chap. 6; Blackstone Com., vol. 1, p. 146; Sutherland on Stat. Con., p. 5, Sec. 6; Taylor v. Com., 3 J. J. M., 401; State, *ex rel.* Holt v. Denny, 118 Ind., 449; State *ex rel.* Jameson v. Denny, 118 Ind., 382; State, etc., v. Noble, 118 Ind., 350; Evansville v. State, *ex rel.*, etc., 118 Ind., 426; State v. Yancey, 121 Ind., 20; Smith v. Myers, 109 Ind., 1; Low v. Towns, 8 Ga., 360; Cooley Con. Lim., Star pages 87, 88, 89, 93, 114, 175; Sedgw. Const. & Stat. Con., (2d ed.) pp. 132, 138, 184; 10 Wheat. 1; Greenough v. Greenough, —— Pa. Stat., 489; Am. & Eng. Enc. of Law, vol. 3, p. 386.

3. Constitution, Secs. 23, 93, 107, 160; People v. Perry, 79 Cal., 110; Howard v. State, 10 Ind., 100; Connors v. State, 5 Kan., 688; Throop on Public Officers, book 3, Sec. 305 and notes.

4 Joint Assembly not authorized to elect. Prison Act, 1898, Sec. 1; 31 Neb., 262; North Carolina, *ex rel.* v. Ellington, 30 L. R. A., 532.

C. J. BRONSTON, ON THE SAME SIDE.

1. The Goebel Election Law is unconstitutional.

(a) It is an act amendatory in letter and effect, materially and intentionally changing an existing law, and attempting to extend certain provisions thereof without re-enacting and publishing the law as changed and extended, made mandatory by Sec. 51 of the Kentucky Constitution.

(b) If it be considered an independent act, complete in itself, not intending to modify or change an existing law, or to extend any of its provisions as modified and changed, it violates Sec. 6 of the Bill of Rights; it exceeds the power given to regulate and uses it to advance selfish, factional partisan interests to the denial of free and equal elections.

2. It is contrary to the fixed principles of republican institutions; it destroys local self government; it so concentrates powers as to create a political machine, which, in effect, may be controlled by one man; it is undemocratic, autocratic and despotic in its tendencies; it is cowardly, corrupt and dishonest in its real purpose; it is repulsive to the intelligent and courageous manhood of freemen.

Citations: Ky. Con., Sec. 51; Am. & Eng. Ency of Law, vol. 23, p. 278; People v. Mahaney, 13 Mich., 497; State v. Trenton, 53 N. J. L., 570; Fite v. Black, 85 Ga., 413; Todd v. State, 85 Ala., 339; Rogers v. Torbut, 58 Ala., 523; Bolling v. LeGrand,

87 Ala., 482; Stewart v. Hale County, 82 Ala., 209; Tuskaloosa
Bridge Co. v. Olmstead, 41 Ala., 9; Judson v. Bessemer, 87 Ala.,
240; Watkin v. Eureka Springs, 49 Ark., 131; Smith v. State, 29
Fla., 408; Walker v. Caldwell, 4 La. Ann., 297; Duverge v. Salter,
5 La. Ann., 94; State v. Hackett, 5 La. Ann., 91; Kohn v. Car-
rollton Tp., 10 La. Ann., 719; Arnoult v. New Orleans, 11 La.
Ann., 56; Halher v. Caldwell, 4 La. Ann., 297; State v. Miller,
100 Mo., 439; Smith v. State, 34 Neb., 689; State v. Corner, 22
Neb., 265; 3 Am. St. Rep., 267; Portland v. Stock, 2 Ore., 70;
Com. v. Mercer, 9 Pa. Co. Ct. Rep., 461; McKeever v. Victor Oil
Co., 9 Pa. Co. Ct. Rep., 284; Johnson v. Martin, 75 Tex., 33;
Evansville v. State, 118 Ind., 426; Campbell v. Board of Pharm-
acy, 45 N. J. L., 241; 47 N. J. L., 347; Evernham v. Hulit, 45
N. J. L., 53; Haring v. State, 51 N. J. L., 386; Colwell v. Cham-
berlin, 43 N. J. L., 388; State v. McNeal, 48 N. J. L., 407; Pitts-
burgh's Petition, 138 Pa. St., 401; Gilbert v. Moody, 25 Pac. Rep.,
1092; People v. Judge, 39 Mich., 195; Callaghan v. Chipman, 59
Mich., 616; People v. Detroit, 38 Mich., 636; People v. Pritchard,
21 Mich., 236; Fenton v. Yule, 27 Neb., 758; State v. Babcock, 23
Neb., 128; Wilkinson v. Ketler, 59 Ala., 309; Callaghan v. Jen-
nings, 16 Col., 471; Edwards v. Denver, &c., R. Co., 13 Col., 559;
Booneville v. Trigg, 46 Mo., 288; Martinsville v. Frieze, 33 Ind.,
509; Smailes v. White, 4 Neb., 353; Sovereign v. State, 7 Neb.,
409; Stricklett v. State, 31 Neb., 674; *In re* House Roll, 284, 31
Neb., 505; Batman v. Megowan, 1 Met., 533; Cooley's Con. Lim.,
p. 602; City of Owensboro v. Hickman, 90 Ky., 629; Com. v. Mc-
Clellan, 83 Ky., 686; Capon v. Foster, 12 Pick., 488; Page v.
Allen, 58 Pa. St. Rep., 346; Section 6, Bill of Rights.

W. H. HOLT, ALSO FOR APPELLANTS.    (Brief not in the record.)

JOHN W. RAY, FOR APPELLEES.

1. By section 153 of the Constitution the Legislature is given power
    to enact any law in regard to elections, except as to the quali-
    fication of the voter, manner of voting (by ballot) and between
    certain hours, and the trial of contested elections for Governor
    and Lieutenant-Governor and members of the General Assembly.
2. The contesting boards for the State nor county are courts within
    the meaning of Sec. 135 of the Constitution, prohibiting the
    establishment of other courts. Thompson v. Koch, 98 Ky., 400;
    Gibbs v. Board of Aldermen, decided June 16, 1896; as also the
    fact that the first Legislature after the adoption of the Constitu-

tion interpreted this section 135 differently, and made boards
of contest that were not the courts of the Constitution, and
these boards have been recognized by this court repeatedly as
legal bodies, and their action has been affirmed by this court.

3. The right of suffrage is not one of the necessary privileges and
immunities of the citizen, the abridgement of which is prohib-
ited by the Federal Constitution. Williams v. State of Missis-
sippi U. S. Supreme Ct., Apl. 25, 1898; Minor v. Happersett, 21
Wallace, 162; Murphy v. Ramsay, 114 U. S., 43.

4. The old law as to elections, as to appeals in contested cases, is
not repealed, but is still the law.

5. The manner of the passage of the act and the election of the
State Commissioners is identical with the facts in the prison
question and the opinion in that case is conclusive of this one.

SAME COUNSEL IN A SUPPLEMENTAL BRIEF FOR APPELLEES.

Additional Citations: Geisen v. Heiderich, 104 Ill., 537; State
v. Bennett, 102 Mo., 356; Anderson v. Com., 18 Gratt., 295; Home
Ins. Co. v. Taxing District, 4 Lea., 644; Lehman v. McBride, 15
O. St., 573; State v. Miller, 100 Mo., 439.

W. S. PRYOR, FOR APPELLEES, IN A SUPPLEMENTAL BRIEF.

1. The Goebel election law does not violate the provisions of the
Bill of Rights with reference to free and equal elections. Com.
v. McClelland, 83 Ky., 686. The objections urged by counsel to
the existing law would be equally applicable to the old law.

2. The act in question is not unconstitutional in violating the pro-
visions of the section requiring amendatory acts to set forth in
full the act as amended. Cooley Con. Lim., Williams v. Missis-
sippi, U. S. Sup. Ct., April 25, 1898; Minor v. Happersett, 21
Wal., 162; Murphy v. Ramsay, 114 U. S., 43; State v. Miller, 100
Mo., 439; Lehman v. McBride, 15 O. St., 573; Home Ins. Co. v.
Taxing District, 4 Lea., 644; State v. Bennett, 102 Mo., 356.

CHIEF JUSTICE LEWIS DELIVERED. THE OPINION OF THE COURT.

The judgment before us for revision was rendered in an
agreed case where appellants, Purnell, judge of the coun-
ty court, Paxton, clerk thereof, and Bowen, sheriff of Bour-
bon county, seek to have appellees, Mann, Clay, and Smith,
enjoined from exercising the authority conferred or per-

forming the duties imposed upon them as members of the board of election commissioners for that county by "An act to further regulate elections," which was passed by the Senate and by the House of Representatives, each, on March 11, 1898, over objections of the governor.   The question of law arising on the agreed facts is as to the validity of the act referred to.   The general power of the judicial department of this state to decide what is the law on each case presented necessarily includes power to inquire and determine whether a particular statute, validity of which is questioned, be consistent with or repugnant to the Constitution.   But not only is it expressly forbidden by section 28 of that instrument to exercise any power properly belonging to either of the other two departments, but there are salutary and inflexible rules, universally recognized in this country, by which the court is controlled in determining when it may or may not interfere to pronounce a statute void.   Legislative power is, and, according to our form of government can be, limited only by restrictions the organic law imposes.   Hence, as said in Griswold v. Hepburn, 2 Duv., 20:  "Whenever a jurist inquires whether a State statute is consistent with the State Constitution, he looks into that Constitution, not for a grant, but only for some limitation of the power inherent in the people's legislative organ, so far as not forbidden by their organic law."   In City of Lexington v. McQuillan's Heirs, 9 Dana, 513, [35 Am. Dec., 159], the question was as to validity of a statute by which power was given to the mayor and councilmen of Lexington to have the streets and alleys paved at expense of owners of adjacent lots; and although it was contended the statute violated the principle of equality of taxation, and disregarded the doctrine that taxation and represen-

tation should go together, the statute was upheld. In the subsequent case of City of Louisville v. Hyatt, 2 B. Mon., 177 [36 Am. Dec., 594], in which arose a similar question, the court, after admitting a doubt of the validity of the statute question in the case of City of Lexington v. McQuillan's Heirs, used this language: "Yet it does seem to us that we would be justly chargeable with wandering from the appropriate sphere of the *judiciary department* were we, by subtile elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and unjudicial grounds to defy and overrule the public will clearly announced by the legislative organ. Whenever this court shall be well convinced that a legislative act is unconstitutional, it should not hesitate to pronounce it so, and therefore disregard it as void. But the *policy* and *justice* of legislation belong not to the judicial, but legislative, discretion. And to merely doubt legislative power is not enough to justify judicial resistance." It could be readily deducted from what was there said, even if it was not settled doctrine, that the judiciary can not pronounce a statute unconstitutional and void because it may, in the opinion of the court, be impolitic, unjust, or oppressive, or because it appears to violate what might be deemed fundamental principles, or what is called the "genius and spirit of our institutions." The true and only test of the validity of a statute which the court can properly apply is whether it be in express terms or by clear implication forbidden by the Constitution, and, if there be a doubt on the subject, it is the duty of the court to resolve it in favor of the validity of such statute. For the judiciary to apply

any other test would be for the judiciary itself to become *pro tanto* law-maker.

A statute such as the one in question, which relates exclusively to administration of the government, must be presumed by the court to have been enacted with knowledge of, and under instructions by, the people; and, if not so, it is always subject to repeal, which is the natural and safest process by which, in a government like ours, to get rid of an objectionable statute. Nevertheless the court, observing the rules mentioned, should not shrink from so pronouncing, if satisfied such statute is invalid. The general election law of June 30, 1892, being contained in chapter 41, Ky. Stat., is, or was intended to be, a complete system securing to every person having requisite qualifications the right and opportunity to vote, and ascertaining and declaring the true result of elections. By section 1447, being part of article 3, c. 41, Ky. Stat., each county court is empowered to appoint officers of election. Section 1507 provides that the judge of the county court, clerk thereof, and sheriff shall constitute a board for examining returns of elections in each county and giving certificates of election. By section 1534 the judge of each county court and two justices of the peace are constituted a board for determining contested election of county officers; and by section 1553 the Governor, Attorney General, Auditor, and Secretary of State constitute a board for determining contested elections of any officers, other than Governor or Lieutenant Governor, elective by voters of the whole State, or of a judge of the Court of Appeals, circuit judge, and Commonwealth's attorney. By the act in question it is provided the General Assembly should elect three commissioners, styled "The State Board of Election Commissioners," which has been done; said board being

empowered to appoint a "County Board of Commissioners," composed of three persons.  The latter board is authorized by the act, instead of the county court, to appoint for each county officers of elections.  It constitutes, instead of the county judge, clerk, and sheriff, the canvassing board for each county; and, instead of the county judge and two justices of the peace, it constitutes the contesting board for each county.  It is further provided that the State board of election commissioners shall constitute, instead of the Governor, Attorney General, Auditor, and Secretary of State, a board for determining contested elections of any officer, other than Governor and Lieutenant Governor, elective by voters of the whole State, or of a judge of the Court of Appeals, circuit judge, or Commonwealth's attorney.  The act contains other provisions, a reference to which at this place is not necessary for determination of the questions involved.

1. It is contended the statute in question was not enacted as required by section 51 of the Constitution, as follows: "No law enacted by the General Assembly shall relate to more than one subject and that shall be expressed in the title; and no law shall be revised, amended, or the provisions thereof extended or conferred  by reference to its title only, but so much thereof as is revised, amended, extended or conferred shall be re-enacted and published at length."  The first clause of that section was section 37 of the Constitution of 1850, and the object of it was to prevent passage of any act having a title misleading or imperfect, or relating to two or more subjects foreign to each other, whereby members of the General Assembly and people were deceived or misinformed as to the true or whole purport of it.  But the second clause, added by framers of the present Constitution, ap-

plies to acts revised or amended. Though section 51 re-
lates to the form or manner of enactment, rather than
to the subject-matter, it was, we think, so intended, and
should be treated as mandatory.  But, as substantial com-
pliance with section 37 of the Constitution of 1850 was
held to be sufficient, section 51, as it now stands, should be
construed and applied the same way.  The question then
arises how to construe the provision, "but so much thereof
as is revised, amended, extended or conferred shall be
reenacted and published at length," so as to substantial-
ly comply with that section.  We think the manifest in-
tention was that the provision should apply only to so
much of the law as, after passage of the new act, remains
in force amended.  To construe it otherwise would in-
volve an absurdity, for while a law, or part of a law, that
is repealed, or for which a substitute has been adopted,
might be republished, though to no purpose, it certainly
was not intended it should simultaneously die and be re-
enacted.  The Constitutions of many States contain a sim-
ilar provision.  In regard to the purpose of such provision,
in People v. Mahany, 13 Mich., 497, it was said:  "The mis-
chief designed to be remedied was the enactment of amen-
datory statutes in terms so blind that legislators them-
selves were sometimes deceived in regard to their effects,
and the public, from the difficulty in making the necessary
examination and comparison, failed to become apprised
of the changes made in the laws.  An amendatory act,
which purported only to insert  certain words, or to sub-
stitute one phrase for another, in an act or section which
was only referred to, but not published, was well calcu-
lated to mislead the careless as to its effect."  Judge Coo-
ley, in his treatise on Constitutional Limitations, having
cited that case, said:  "If this be a correct view of the

purpose of the provision, it does not seem to be at all important to its accomplishment that the old law should be republished, if the law as amended is given in full, with such reference to the old law as will show for what the new law is substituted.  *  *  *  It is believed that the general understanding of the provision in question is that it is fully complied with in letter and spirit if the act or section revised or amended is set forth and published as revised or amended, and that anything more only tends to render the statute unnecessarily cumbrous." We have been referred by counsel to a number of cases sustaining Judge Cooley, but need not mention them, because satisfied that republication of a law then and thereby repealed is not required by section 51 of the Constitution. There is no direct reference made in the act in question to any particular section of the general election law amended or repealed by it, nor do we think section 51 expressly or impliedly requires it done. The act as passed and published is full and specific enough, as to all subjects embraced by it, to show for what parts of the general election law it is substituted; and these parts are both in terms and by implication repealed, leaving the residue unaffected and in full force. Manifestly, neither members of the General Assembly nor the people could misunderstand or be deceived as to the purview, purport, or effect of the act.

2. It is contended that the act is repugnant to section 6 of the Bill of Rights, which reads: "All elections shall be free and equal." Counsel argues that, to make elections free and equal, in meaning of that section, it is not sufficient that all who possess the requisite qualifications are afforded a reasonable opportunity to vote without being molested or intimidated, but to maintain "equality" it is necessary that *leading* parties should be recognized

in selecting officers of election.   It is true, honest elections
are necessary to obtain a fair expression of the will of the
people.    But can this court determine that an election law
is unconstitutional and void for the sole reason it does
not provide for selection of election officers of different
political parties?   The Constitution of 1792, that of 1799,
and that of 1850, each contained a Bill of Rights, in which
was the mandate that all elections should be free and
equal; but no statute requiring officers of elections to be
of different political parties was ever passed until 1858.
So, if the argument of counsel be sound, there was not a
valid election law in this State until 66 years after it was
founded.    Whether such provision is necessary or con-
ducive to securing free and equal elections is a question
purely of legislative discretion, about which the Constitu-
tion is silent, and in regard to which it is not the province
or right of the court to decide.    The act in question does,
however, require the county board to select officers to hold
elections belonging to different political parties, just as
did the general election law, before being amended, re-
quire the county court to do.    And if it be said the county
board owes its existence to the State board, composed
wholly of members of one particular party, it may be
answered the county judge is usually elected with refer-
ence to his party affiliation.    But the truth is, neither the
old nor the new law could or does fully accomplish the
object of wholly devesting the appointment of election
officers from party bias or influence, and it would be dif-
ficult to frame a law that would do so.    It would, there-
fore, be futile for this court, even if the subject was within
its proper sphere, to pronounce a statute void because de-

[7]

fective in that respect, when the law thereby revised is little, if any, less so.

3. It is contended that the act in conferring power upon the State board to appoint members of the county board, and investing them with authority to appoint election officers and to act as canvassing and contesting boards, violates the principle of local self-government. We do not regard the principle of local self-government at all involved, because the duties imposed upon officers of election, as well as those assigned to the two boards, concern the State government. But, conceding the act does so, the question again arises whether the Constitution in express terms or by clear implication forbids exercise of legislative discretion as to that matter. We are satisfied it does not, and therefore this court has no excuse to interfere on that ground.

4. The act does not, as argued, violate section 161 of the Constitution, which forbids the compensation of any city, county, town, or municipal officer being changed during his term of office; for the duties imposed by the general election law upon the various county officers do not, except in virtue of a repealable statute, pertain at all to several offices, and, of course, when they are by an amendatory statute relieved of these duties, their *per diem* pay ceases without at all involving a change of compensation in meaning of section 161.

5. Whether election by the General Assembly of the State board of elections and appointment by it of the county board, provided for in the act, involve exercise of power by the legislative department properly belonging to the executive department, and are consequently forbidden by section 28 of the Constitution, is a question to some extent considered in the case of Sinking Fund Commissioners v. George

(decided at the last term of this court) [47 S. W., 779]. But, as it is suggested this case is not like that, we will make some remarks on the subject in addition to what was said in that case.    Section 153 of the Constitution is as follows: "Except as otherwise herein expressly provided the General Assembly shall have power to provide by general law for the manner of voting, for ascertaining the result of elections and making certificates or commissions to persons entitled thereto and for trial of contested elections." As plenary power over the subject of elections is thereby given, it at least is a fair inference, in the absence of any provision forbidding, that exercise of power by the General Assembly in the manner provided by the act in question is permitted.    Section 93 is as follows:  "Inferior State officers not specifically provided for in this Constitution may be appointed or elected in such manner as may be prescribed by law for a term of not exceeding four years, and until their successors are appointed or elected and qualified."    And section 107 reads:    "The General Assembly may provide for the election or appointment, for a term not exceeding four years, of such other county or district ministerial or executive officers as may from time to time be necessary."    As power is expressly given by these two sections to the General Assembly, in its discretion, to create, in addition to the officers mentioned in the Constitution, both State and local offices, to be filled by either election or appointment, the court, in absence of express or clearly implied limitation of that power, is not justified in deciding it has been exceeded or improperly exercised by election of the State Board and appointment by it of the County Board as provided by the act.    As said by Chief Justice Marshall in the case of Fletcher v. Peck, 6 Cranch, 89:    "How far the power of giving the law involves every

other power, in cases where the Constitution is silent, never has been, and perhaps never will be, stated." The power of appointing officers can not, in view of the present scheme of our State Government, be said to belong peculiarly or inherently to the executive department. Whatever might have been the condition prior to the Constitution of 1850, where all officers, except a few classes of local officers, were appointed by the Governor, it was radically changed by that Constitution, which took from him power to originally appoint any officer except Secretary of State; and by the present Constitution he is deprived of the power to appoint even that officer. We are unable to perceive that the act in question is forbidden in express terms or by clear implication of the Constitution. Nor does it have effect to hinder operation or enforcement of any part of the general election law, except such parts thereof, plainly indicated and easily understood, as are inconsistent with and repealed by it. Whether legislative power has, as argued, been exercised in an unwise, improvident, or dangerous manner, is not for this court to decide, our power being restricted to the single inquiry whether the Constitution has been violated. The people alone, through the Legislature, must determine as to justice and policy of the statute. Judgment affirmed.

Dissenting opinion by Judge Guffy.

The constitutionality of an act entitled "An act to further regulate elections," passed March 11, 1898, over the objections of the Governor, is the sole question involved in this case. The majority opinion of the court holds the act to be constitutional. I am not able to assent to the conclusions reached by the majority opinion of the court, and the question involved is of so much importance, and

in my opinion so utterly inconsistent with the principles
of republican government, that I feel it to be my duty to
file this dissenting opinion.

The Legislature in June, 1892, enacted a general election
law for the State, which may be found in chapter 41, Ken-
tucky Statutes, and, beyond question, contained complete
provisions for the conduct of all elections authorized by
the Constitution, or laws enacted thereunder for the hold-
ing of elections, including the receiving and canvassing
of the returns, issuing certificates of election, and provid-
ing for the trial of contested elections.   The act under con-
sideration is in conflict with many provisions of said chap-
ter 41, and, if valid, necessarily repeals same, without
making direct reference to any portion of chapter 41 so re-
pealed, and, in my opinion, is a flagrant violation of sec-
tion 51 of the Constitution, which reads as follows:   "No
law enacted by the General Assembly shall relate to more
than one subject, and that shall be expressed in the title,
and no law shall be revised, amended, or the provisions
thereof extended or conferred by reference to its title only,
but so much thereof as is revised, amended, extended or
conferred, shall be re-enacted and published at length."
Some effect must necessarily be given to the section, *supra*,
and the only purpose that seems reasonable is that it was
intended by the provisions of said section that, whenever
any act of the Legislature was amended or repealed, the
existing law, or at least so much thereof as was amended
or repealed, should be republished in connection with such
amendment or additional enactment, to the end that when
presented to the Legislature the members can readily see
what the law would be with the amendment or repealing
clause in force, and thereby be enabled to judge and deter-
mine as to whether the proposed modification should be

Purnell, &c., v. Mann, &c.

made, or whether the original act ought to remain intact, and, besides, to enable citizens, upon an examination, to readily determine what the existing statute required by an examination of the one act. It is not material to the consideration of this question whether section 51 is a wise provision or not; but, in my mind, it is a wise and salutary provision, necessary to the intelligent discharge of legislative duties, and necessary to enable the citizens and officials of the State to readily and unmistakably ascertain the requirements of the various acts or statutes enacted for the government of the people. The act under consideration makes no reference whatever to the various portions of chapter 41, *supra*, which are supposed to be repealed by the act in question; and, as a matter of fact, there seems to be an honest difference of opinion among the members of the bar, if not the bench, as to how much, if any, of chapter 41 stands repealed, and how much in force. I am satisfied that the act in question is invalid because it violates or disregards section 51 of the Constitution, *supra*, and is void for the further reason that if taken into consideration in connection with chapter 41, *supra*, it is uncertain as to what is the law now in force for the government and conduct of elections.

Section 6 of the Constitution reads as follows: "All elections shall be free and equal." It is a well-known fact, of which courts must take judicial notice, that elections, and the general policy of the government, are conducted in and through political parties; and the act in question places it in the power of one political party to select all the State commissioners and county commissioners from one political party, and those so selected also constitute the Board of Contest; and it seems to me that the manifest meaning of section 6 is to forbid any such legislation. It

may happen that the majority of the voters of the State might be entirely deprived of selecting a solitary one of the State or county commissioners. It is well known that in some counties one political party has the majority, and consequently has the right to select for county officers persons who sympathize with the dominant party, and it seems to me that that principle is vital to the question of well-regulated self-government; and prior to the enactment of the act in question the officers so selected by the people controlled the appointment of election officers for the several precincts, who canvassed the returns, issued the certificates of election, and also constituted the Board of Contest for county officers. But all this is done away with by the act under consideration, and vested in three commissioners, who may all belong to the political party largely in the minority in said county, and appointed by the State Board of Commissioners, who owe their appointment to a party majority in the Legislature.

Section 161 of the Constitution reads as follows: "The compensation of any city, county, town, or municipal officer shall not be changed after his election or appointment, or during his term of office; nor shall the term of any such officer be extended beyond the period for which he may have been elected or appointed." The act in question is a violation of section 161, above quoted, for the reason that it deprives the several county judges, clerks, and sheriffs in office at the time of its enactment of fees which under the then existing laws they were entitled to at the time of their elections; and it is no answer to this contention to say that they are relieved of duties which under the former statute they were required to perform. The evident intention of section 161 was to render every officer secure in the emoluments of the office existing at

the time he was elected, and also to prevent such officers from seeking to influence the Legislature to increase their fees or emoluments, and is a wholesome and salutary provision.    It makes the officers independent of legislative power, and also relieves the Legislature from being importuned by officers to increase their fees or salaries.    In the case of Bright v. Stone, Auditor (Ky.) [43 S. W., 207], this court decided that an act of the Legislature enacted in 1894, providing that the clerks of the various circuit courts of this Commonwealth, etc., shall be entitled to, and allowed and paid by this Commonwealth, a fee of five dollars for ser-.vices rendered or performed by them respectively for the Commonwealth in all felony cases, or prosecutions by indictment for felony, in their respective courts, except in such prosecution in which the defendant may, under a felony indictment, be convicted for misdemeanor.    Bright had been elected circuit clerk in 1892, and hence the validity of section 161, *supra*, was directly involved; and in deciding the case the court said:    "As that statute was passed after the appellant's term of office commenced, the decisive question arises whether the fees or compensation sued for come within the provisions of section 161 of the Constitution, as follows:    'The compensation of any city, county, town or municipal officer shall not be changed after · his election or appointment, or during his term of office; nor shall the term of any such officer be extended beyond the period for which he may have been elected or appointed.'    Prior to the statute in question the compensation of the clerks of the circuit and county courts of the Commonwealth had been paid not out of the State treasury, but by fees authorized to be fixed and taxed in specified sums for designated services; and thus was the aggregate compensation of each ascertained, and authorized to be collected

and appropriated. But no fees had, before that statute, ever been allowed for the services rendered by circuit clerks in felony cases. It is therefore plain that, however just it may be to pay for services of that nature out of the State treasury, circuit clerks in office when the statute was passed are not entitled to the benefit of its provisions, because, in the explicit language and meaning of section 161, the compensation of such officers was thereby changed." It will be seen from the opinion *supra* that this court expressly held that the fees or compensation of an officer can not be changed during his term of office. It is a well-settled rule of law that what the Legislature can not do directly it shall not do indirectly; hence it can not lessen or destroy the fees or compensation of an officer by creating a new officer, and devolving upon him the duties, or require from him services, that had theretofore been required of the officer then in office. If the Legislature can by the enactment of the law in question deprive the county judge, clerk, and sheriff of the statutory fees to which they are entitled, and to which they had always theretofore been entitled, then they may be deprived of all fees by simply relieving them from performing the services, and giving the employment and fees connected therewith to the incumbent of some new office which the Legislature might see fit to create, and then proceed to select the men to fill it. Such a power is much greater than the increase or diminution of the fees which is prohibited by section 161. If the Legislature can create a new office, and appoint persons to fill the same, and authorize them to perform services theretofore required by the person then in office, they can utterly destroy the fees and emoluments of every county officer in the State of Kentucky. For instance, it may create the office of Recorder, and provide that he shall

record all the deeds and mortgages, issue all the licenses,
and, in short, perform all the other duties that are now
required of the county clerk, or it might create the office
of county treasurer, and require him to perform all the
duties of the sheriff, and so in regard to all the other
county officers; for it must be remembered that the Consti-
tution itself does not provide that any of the officers
named shall continue to discharge the duties required of
them by the then existing statute, but their duties and fees
are prescribed by law, and the Constitution only guaran-
tees that the fees shall not be changed during the term for
which such officers are elected. If the Legislature can ex-
ercise the power hereinbefore indicated, it may also create
the office of Comptroller, and require that he perform all
the duties that have been heretofore required of the State
Auditor, and therefore deny to the Auditor the payment of
any salary, and, upon the same principle, pass similar laws
relative to the Treasurer, Secretary of State, etc., relieving
them from the performance of the duties required of them,
and deny them the salaries provided by law.

It occurs to me that the act under consideration is in
violation of section 28 of the Constitution, which reads as
follows: "No person or collection of persons, being of
one of those departments, shall exercise any power pro-
perly belonging to either of the others, except in the in-
stances hereinafter expressly directed or permitted." It
seems to me that the election of State Commissioners pro-
vided for is an exercise of executive power, and therefore
in conflict with section 28, supra.

Section 135 of the Constitution reads as follows: "No
courts, save those provided for in this Constitution, shall
be established." This new county as well as State Board
of Contest to try contested elections is essentially a court

created by the Legislature, and not provided for by the Constitution. It is essentially a judicial act to adjudge an office to a person, or deprive a person of an office.

Section 107 provides that "the General Assembly may provide for the election or.appointment, for a term not exceeding four years, of such other county or district ministerial and executive officers as may, from time to time, be necessary." This provision only authorizes the appointment of ministerial and executive officers, and, taken in connection with the other provisions of the Constitution, necessarily prohibits the appointment of any additional judicial officers.

Section 93 of the Constitution provides that: "Inferior State officers not specifically provided for in this Constitution, may be appointed or elected, in such manner as may be prescribed by law, for a term not exceeding four years, and until their successors are appointed or elected and qualified." The three Election Commissioners selected under the provisions of the act in question are in no sense inferior officers, and can not be so treated or recognized. They have greater power than any other tribunal in the State. They are authorized to canvass the returns for every State officer, for judges of the Court of Appeals, circuit judges, Commonwealth's attorneys, as well as members of congress. They have exclusive and final jurisdiction of all contested elections of Commonwealth's attorneys, circuit judges, judges of the Court of Appeals, and all State officers except Governor and Lieutenant Governor; and it is worthy of note that the returns sent to them are sent by officers appointed by the State Commissioners. They may in fact absolutely determine who shall hold the offices hereinbefore enumerated. I can not believe it possible that the framers of the Constitution ever in-

tended to, or in fact did, authorize the Legislature to invest the three commissioners with such supreme power. It will be seen that the term of office is four years, and, if a vacancy occurs in said Board whilst the General Assembly is in session, such vacancy shall be filled by election by the General Assembly, but, if a vacancy occurs while the General Assembly is not in session, such vacancy shall be filled by appointment by the remaining member or members of said Board; so that in no state of case do the people have any voice in the selection of the commissioners, nor in the filling of any vacancies that may occur during their term of office. The State Commissioners appoint the county Commissioners, who constitute the County Board, who may be removed by the State Commissioners at any time. Thus, it will be seen that three men have absolute control of the entire election machinery of the State, and the final determination of all contests for all the State offices except Governor and Lieutenant Governor as well as the judicial offices hereinbefore mentioned.

If any reliance can be placed in current history of the day, great efforts are being made by unworthy persons or associations to obtain all possible control of official and political power, for the purpose of using the same for selfish or unworthy purposes. If, from any cause, such malign influences should ever be able to procure the selection of two out of the three State Commissioners who were alike willing to serve such unworthy interests, it would be impossible for any considerable number of men not in sympathy with such unworthy purposes ever to hold any of the aforesaid important offices in the State; and it would be alike impossible to ever elect a Legislature that would repeal or modify the act in question, or elect

a different kind of commissioners. I cheerfully admit that the three present commissioners are competent and trustworthy men, and that no such dire results will occur while they administer the trusts confided to them; but it is manifest to me that it is unconstitutional to invest three or even a larger number of men with the absolute and unlimited power which this act gives to the aforesaid State Commissioners.

The majority opinion quotes sec. 153 of the Constitution, which reads as follows: "Except as otherwise herein expressly provided, the General Assembly shall have power to provide by general law for the manner of voting, for ascertaining the result of elections and making due returns thereof, for issuing certificates or commissions to all persons entitled thereto, and for the trial of contested elections." If the section *supra* is to be given the construction that the majority opinion seems to attach to it, namely, that there is no restriction on the power of the Legislature as to the creation of new offices, and appointing the officers to conduct and control elections then it would follow that the Legislature may appoint one commissioner for life, with power to appoint one or more commissioners in each county, and one in each precinct, to conduct elections, make returns, issue certificates and commissions, and try all contests. The evident meaning of the section *supra* is that through the officers created and provided for by the Constitution, and consistently with its provisions, the Legislature should provide for the conduct of elections, including contests, etc. The construction given by the majority opinion to section 153 is clearly in conflict with section 2 of the Constitution, which says, "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even

in the largest majority;" and also in conflict with section 4, which declares that "all power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness and the protection of property. *   *   *"

It seems from current history, that a considerable portion of the population fear that corporations may seize upon and control the whole election machinery, and thereby wield it in their own interest, and to the detriment of the people at large. If there be any foundation for such apprehension, it is natural that such corporations would endeavor to secure the selection of the State Election Commissioners, and if they could do so, and could make them subservient, corporation control would be complete. On the other hand, if current history be true, quite a number of people fear that the anarchists or the lawless element will obtain governmental control, and thereby destroy property and individual rights. If there be any such desire, it is not unreasonable to suppose that that element will seek to secure the appointment of State Commissioners who will subserve their purposes; and, if they can succeed, then the community at large will be utterly under the control of that pernicious element. It may be true that the apprehension in regard to both these elements is entirely unfounded, yet the safety of the community demands that such control should, as far as practical, be made utterly impossible. For nearly half a century the people of the various counties have been allowed to elect their officers that control and manage county elections, so far as the appointment of county officers to conduct elections, canvass the vote, and certify the returns is concerned, and also elect the men who constitute the county board of contest, and for about the same length of time the voters of

Purnell, &c., v. Mann, &c.

the State have selected the men who constitute the State canvassing board and the State Board of Contest; and it seems to me that it is a subversion of the principles of self government, as well as a violation of the Constitution, to depart from this long-sanctioned principle and policy. The act in question never was presented to or discussed before the people prior to its enactment. The act in question absolutely denies the people any voice in the selection of any of the officers who conduct elections, canvass the returns, certify the results, issue certificates of election, and try contested elections. It can not be that such an act is constitutional. For the reasons given, and others that might be stated, I most earnestly and respectfully dissent from the majority opinion rendered in this case.

Dissenting opinion by Judge DuRelle.

In a dissenting opinion filed in the case of Sinking Fund Commissioners v. George, etc., decided June 23, 1898, I stated a few of my objections to the act establishing a Board of Prison Commissioners, and more especially my objections based upon the ground that the act was inherently vicious, as an invasion by the Legislature of the powers of the Executive.

It is unnecessary here to go into the history of the constitutional provision, which I think has been violated by this act. That provision was drawn by Mr. Jefferson, with the provision of the Federal Constitution before him, and was designed by him as an improvement upon the provision therein contained, to insure a more perfect separation of the powers and privileges of the three great departments of government than was secured by that instrument. Knowing its purpose and its author, the fathers of the Kentucky Constitution adopted that provision, and it has remained unchanged in each successive Constitution adopt-

ed by this Commonwealth, except that the present Constitution requires that each of the departments of the powers of the government shall be *"confined to"* a separate body of magistracy, instead of *"confided to,"* as in the previous instruments, indicating, if possible, a more earnest desire on the part of the framers, for a complete separation of the powers assigned to each body of magistracy. The provision is as follows:

"Sec. 27. The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to-wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

"Sec. 28. No person, or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

The Constitution of the United States provides only that "all legislative powers herein granted shall be vested in a Congress of the United States," with similar provisions as to the vesting of judicial and executive powers in the judiciary and the President, respectively. But it contains no inhibition against one of the departments exercising powers properly belonging to another, such as is contained in the Kentucky Constitution.

The reasons which seemed to me sufficient to justify us in holding the act creating the Board of Prison Commissioners unconstitutional apply with even greater force in the case at bar; for, in the former case, it could be argued with at least some show of plausibility that the Prison Commissioners were legislative agents. There is no pretext for holding the offices created by the act now under

consideration to be agencies. They are offices, and so con-
ceded to be.

In City of Louisville v. Wilson (99 Ky. 598) [36 S. W., 944]
Chief Justice Lewis thus defined an officer: "There are vari-
ous tests by which to determine who are officers in the mean-
ing of the law; but at last, in case of uncertainty, the in-
tention of the law-makers controls. To constitute an offi-
cer, it does not seem to be material whether his term be
for a period fixed by law, or endure at the will of the creat-
ing power; but if an individual be invested with some por-
tion of the functions of the government, to be exercised
for the benefit of the public, he is a public officer."

There can be absolutely no doubt that the appointees
under this act are officers within the meaning of the Con-
stitution. If so, can they be appointed or elected by the
Legislature?

It has been held by this court, through Chief Justice
Robertson, that appointment to office is "intrinsically ex·
ecutive." In Taylor v. Commonwealth (3 J. J. Mar., 401),
that great judge said:

"And, although the Constitution has confided to the
courts the appointment of their own clerks, still, the
nature of the power is not changed. It is essentially ex-
ecutive, whensoever, or by whomsoever, it may be exer-
cised. It is as much executive when exercised by the court
as by the Governor. It is the prerogative of appointing to
office, and is of the same nature, whether it belonged to a
court or to the Governor."

The Constitution in force at the time this opinion was
rendered authorized the court to appoint its own clerk.

This doctrine was approved by Chief Justice Ewing in
Justices v. Harcourt (4 B. M., 500). Said the court: "But

[8]

this power is an executive, and not a judicial power. It appertains to, and is exercised in aid of, the appointing power, which is executive, and not judicial." It was approved in an opinion by Judge Marshall, in Gorham v. Luckett (6 B. M., 159). It was again approved in an opinion by Judge Williams, in Applegate v. Applegate (4 Met., 237). It has never, so far as I have been able to ascertain, been disapproved. It has been quoted and followed upon this question in Connecticut (State *ex rel* Coogan v. Barbour, 53 Conn., 85), and by other courts of last resort. But this opinion by one of the ablest—if not the ablest—of the judges who ever sat upon this bench, whose opinions are quoted with deference by the Supreme Court of the United States and the courts of every State of the Union, is overruled in the Prison Commissioners' case and in this case, without even the poor compliment of a reference.

By section 29 of the Constitution, the "legislative power" is vested in a House of Representatives and a Senate, together styled the General Assembly. The Legislature being by this grant vested with all the legislative power, may do everything that can properly be done *by the enactment of a law*, and in addition thereto may do everything that by the Constitution it is expressly directed or permitted to do. Each House may perform the executive act of electing its own officers (secs. 34 and 249); and may perform the judicial acts of judging of the qualifications, elections and returns of its members (sec. 38), punishing disorderly behavior and expelling members (sec. 39). The framers of the Constitution having deemed it necessary to expressly permit the Legislature to exercise the executive power of appointment in specified cases, this permission, by implication, forbids the Legislature to exercise such power in any other case.

Purnell, &c., v. Mann, &c.

The creation of an office is accomplished by the exercise of legislative power. It is done by the enactment of a law. The filling of it—when not exercised by the people, or in some manner directed or permitted by the Constitution—is executive, and must be performed by an executive officer.

The Congress of the United States, deriving its authority from a Constitution which does not contain the inhibition of section 28 of the Kentucky Constitution, has never passed an act which created an office and, at the same time, filled it. Only once has it attempted to do so.

It is not denied that the legislative department can appoint or elect an officer, when the duties of the office appertain to that department. And in this is found whatever justification exists for the Legislature's election of the State Librarian—an office which, without any violent stretch of construction, may be considered as appertaining to the legislative department.

But, while the three commissioners provided for in this act are both executive and judicial officers, they are not in any sense legislative. They perform executive functions in appointing to and removing from office, and in canvassing the returns; and judicial functions in deciding contests. But they perform no legislative functions; nor could the Legislature delegate such power. The Legislature has no more power, in my opinion, to elect or appoint such officers than it has to enact a law providing what judgment shall be entered in a pending litigation, or than the courts would have to call out the militia.

In State v. Kenton (7 Ohio, 547), it was said: "The official or unofficial character of the officers is to be determined * * * by the nature of the functions devolving upon them. * * * To prescribe the manner of election or appointment to office is an ordinary legislative function;

to make an appointment is an administrative function."
The Ohio Constitution forbids the exercise of the appoint-
ing power by the Legislature, but the court is here dis-
cussing the nature of the function.

In Langenberg v. Decker (13 Ind., 478), and the Indiana
Constitution contains a provision like ours—it was said:

"The powers of these departments are not merely equal,
they are exclusive in respect to the duties assigned to each,
and they are absolutely independent of each other. The
encroachment of one upon the other is watched with
jealous care, and is generally promptly resisted, for the
observance of this division is essential to the maintenance
of a republican form of government. * * * It can not
be contended that the State Board of Tax Commissioners
belongs to the legislative department. * * * It can
not be successfully maintained that the Legislature could
confer upon the governor and the principal officers of the
State duties pertaining to the judicial department. As
the State Board of Tax Commissioners is neither a legisla-
tive body nor a court, it must belong to the executive and
administrative department. That it does belong to that
department we think is too plain for argument. It is
charged with executing certain provisions of the revenue
law, and when it has performed that duty its function is
ended."

In Evansville v. State (118 Ind., 426), the court said:
"The power to appoint to office is an executive function,
and while the legislative may provide by law for the ap-
pointment of all officers not provided for in the Constitu-
tion, the appointing power must be lodged somewhere
within the executive department of the government."
(And see State v. Denny, Ib., 382; Evansville v. State, 426;
State v. Denny, 449; and State v. Hyde, 121 Ind., 20.)

In the case of Supervisor of Election (114 Mass., 251), the Legislature had conferred upon the Supreme Court the power of appointment of supervisors, and that court held the act unconstitutional, and refused to exercise the power, saying:

"These supervisors, although intrusted with a certain discretion in the performance of their duties, are strictly executive officers. * * * Their duties relate to no judicial suit or proceeding, but solely to the exercise by citizens of political rights and privileges. We are unanimously of opinion that the power of appointing such officers can not be conferred upon the justices of this court without violating the Constitution of this Commonwealth. We can not exercise this power as judges, because it is not a judicial function."

In Jones v. Perry (10 Yerger (Tenn.), 59), [30 Am. Dec., 430], the court said:

"The whole judicial power of the State being expressly invested in the courts by the Constitution, the exercise of it by the Legislature transcends the power intrusted to it by the Constitution, and can not be legally carried into effect."

In 37 Fed. Rep., 648, under the Federal Constitution, which contained no such inhibition as that contained in our organic law, it was held that the Pension Bureau was not a court, and no officer thereof could be invested with judicial functions; that Congress, therefore, could not authorize the attendance of a witness before a pension examiner to be compelled by the district court.

So in Kilbourne v. Thompson (103 U. S., 168), it was held that Congress could not punish as for contempt a witness who refused to testify concerning transactions of persons whose conduct was then under investigation by a judicial

tribunal, because that was an encroachment upon the judicial department.

In Field v. Clark (143 U. S., 692), it was said: "Congress can not under the Constitution delegate its legislative power to the President."

In Cooley's Constitutional Limitations (p. 104) it is said, speaking of the legislative department:

"But the apportionment to this department of legislative powers does not sanction the exercise of executive or judicial functions, except in those cases warranted by parliamentary usage, where they are incidental, necessary or proper to the exercise of legislative authority, or where the Constitution itself, in specified cases, may expressly permit it."

And on page 108 he says: "The legislative power we understand to be the authority under the Constitution to make laws, and to alter and repeal them;" and quotes from Chief Justice Marshall: "The difference between the departments undoubtedly is that the legislative makes, the executive executes, and the judiciary construes the law."

There are, it is true, cases in other States in which a different view is taken of this question. In many of them the question presented may readily be distinguished from that presented for decision by this court. For example, the Maryland case (Baltimore v. Police Board, 15 Md., 376), [74 Am. Dec., 572], arose under a constitutional provision, which provided merely that "the legislative and executive and judicial powers of government *ought* to be forever separate and distinct from each other"—a provision containing no express inhibition, but merely a declaration as to what was proper. And in Oregon, from which State a case is cited (Biggs v. McBride, 17 Ore., 640), the decisions of the court are directly contrary to the view expressed by

Chief Justice Robertson, that the power of appointment to office is "intrinsically executive." But in this State it may be asserted that the trend of judicial opinion has, wherever the question has arisen, been uniformly against the position taken by the majority opinion. So also has the spirit of each successive change in the organic law of the Commonwealth been in the direction of more strictly limiting the legislative power. In fact, the changes in the organic law would lead us to the conclusion that there existed in the minds of the people a deep-seated distrust of legislative methods, and a fear of legislative usurpation of power.

Section 59 of the present Constitution, as to local and special legislation, is an illustration of this. In that section, twenty-eight subjects are enumerated in regard to which local or special acts are forbidden to be passed by the General Assembly; and in the twenty-ninth clause it is provided: "In all other cases where a general law can be made applicable, no special law shall be enacted."

To show the tendency and policy of the Kentucky court upon this subject, the case of City of Louisville v. Cochran (82 Ky., 15), may be cited. There the General Assembly had passed an act with relation to back taxes in the city of Louisville, which prescribed the form of the petition to recover them, that only certain defenses should be allowed by the court, that all affirmative allegations of the answer should be held controverted, and the tax-bills be evidence of every fact necessary to entitle the city to recover. The act was held to be unconstitutional and void. The opinion by Chief Justice Hargis admitted that the Legislature might by law make the production of certain documents *prima facie* evidence of certain facts, but held that it could not dispense with allegation of essential facts necessary to

the statement of the cause of action, or exclude a defend-
ant *"from showing the truth by a mere legislative declaration
to that effect."*

And the court continued, quoting from Mr. Webster:
"If such results as this act seeks to accomplish could be
reached by the methods it prescribes, 'it would tend di-
rectly to establish the union of all powers in the Legisla-
ture. There would be no general permanent law for courts
to administer or men to live under. The administration
of justice would be an empty form and idle ceremony.
Judges would sit to execute legislative judgments and de-
crees, not to declare the law or administer the justice of
the country.' "

In Johnson v. Ferrell (8 R., 218), the Cochran case was
approved of and followed in an opinion by Chief Justice
Pryor.

In Slaughter v. City of Louisville (89 Ky., 123), this
court, in an opinion by Judge Bennett, recognizing the
binding force of the constitutional provision, interfered to
prevent an encroachment by the Legislature upon the
power of the executive. In that case the inquiry was,
"Can the Legislature, in order to authorize the collection
of *ad valorem* taxes, fix the valuation upon the property to
be assessed?" Said the court:

"It seems to be well settled that the Legislature, as the
law-making department of the State government, has no
constitutional power to fix the valuation of property which
is to be taxed upon *ad valorem* principles. The reason for
this rule is, that the legislative department has no judicial,
executive or ministerial powers, and as the valuation in
this State belongs to the ministerial powers, of govern-
ment it follows that the Legislature has no constitutional
power to make the valuation." * * * "* * * the

Purnell, &c., v. Mann, &c.

Legislature having no judicial, executive or ministerial power, can not make the valuation; but the valuation must be made by some person authorized to exercise in this State ministerial power, and such person is the assessor." (Citing People v. Hastings, 29 Cal., 452, and People v. S. F. Savings Union, 31 Cal., 138.)

And in Morgan v. Vance (4 Bush, 323) it was held that the Legislature could not by statute remove the disabilities incurred by dueling, that power belonging to the executive.

An apparent exception to the rule is found in the case of the county courts. That arose, and is justified, in this way:   Prior to 1792, when Kentucky formed a part of the territory of Virginia, the county courts of that State were not only courts of justice, but were clothed with executive and fiscal duties, and, from the time Kentucky became a State, had continued to exercise those powers and perform those duties. And so in Pennington v. Woolfolk (79 Ky., 13), Chief Justice Cofer concluded from this unbroken practice of nearly eighty years, uniformly acquiesced in by all the departments of the government, during which period the Constitution had been twice amended and re-adopted, that "the convention must be presumed to have been well acquainted with the fact that these non-judicial powers had been conferred by various acts, and were being exercised by the county courts, and the re-adoption of the first article in the very words of the former Constitution, was a virtual recognition of the validity of the statutes by which these powers have been, from time to time conferred;" and that "the county court must be regarded, as respects a number of matters local and exceptional in their nature, as excepted out of these provisions of the Constitution." The present Constitution

legitimizes this exception, and confers upon the county courts administrative functions (secs. 141 and 144).

But this court has never, until the case of Sinking Fund Commissioners v. George and this case, overlooked an encroachment by the Legislature upon the functions of either the executive or judicial departments.

Says Mr. Cooley (Const. Lim., page 105): "Every positive direction in the Constitution contains an implication against anything contrary to it which would frustrate or disappoint the purpose of the provision." And again (page 78): "When the Constitution defines the circumstances under which a right may be exercised,   *   *   * the specification is an implied prohibition against legislative interference to add to the condition." Now, by section 153 it is declared that, "except as otherwise herein expressly provided, the General Assembly shall have power to provide *by general law* for the manner of voting, for ascertaining the result of elections," etc. It seems to me clear that, in a grant of power to provide for the manner of voting, the framers of the Constitution and the citizens whese votes gave that instrument vigor as organic law could not have dreamed that they were conferring upon the Legislature itself the power of electing to office. The grant of this power, it seems to me, directly implies a negation of the power of the legislators themselves to do the voting, the manner of which they are authorized to provide for. But if the Constitution did so authorize them, have they followed the behest of the general law providing for the manner of voting? Is it pretended that, in this case, election officers were appointed by the county court, or that the members of the Senate and House of Representatives voted by the secret Australlian ballot? The record shows the contrary. And the contention that

election by the Legislature is impliedly prohibited is strengthened when we examine section 152, providing for vacancies in election offices arising during a term.  In all cases the office is to be filled by appointment, but the term for which the appointment may be made varies according to the length of time to elapse before the next annual election, referring clearly to the election at which, under section 153, the General Assembly has the power to provide by general law for the manner of voting, etc.  Under this section (152), how are vacancies in these offices to be filled?  The act is claimed to be in compliance with section 153, in that it provides that the Legislature shall elect the commissioners.  The act provides that vacancies "shall be filled by appointment by the remaining member or members of said board," but section 152 provides that "vacancies in all offices for the State at large, or for districts larger than a county, shall be filled by appointment of the Governor."  Surely this provision of the law is unconstitutional, as the commissioners are undoubtedly officers for the State at large.  The Constitution must control, and the Governor's appointee must hold, not until the next session of the Legislature, but, according to the explicit terms of section 152, until the next general election.  And further, by section 148 it is provided that "not more than one election each year shall be held in this State, or in any city, town, district or county thereof, except as otherwise provided in this Constitution."  As the Legislature can not be in session at the time fixed for the annual election, —unless by special call of the Governor,—how can the Legislature, under this section of the Constitution, exercise the power which it has usurped?  The answer is, that the Constitution did not contemplate that any officers, except those specially provided for, should be elected by

the Legislature. Section 76 provides that the Governor "shall have the power, except as otherwise provided in this Constitution, to fill vacancies," etc. Nowhere except in section 152 is it "otherwise provided" how vacancies shall be filled. That section was intended to cover the whole ground, and, as it provides that such appointments shall remain in force until the next general election, negatives the idea of an election by the Legislature. The Federal Constitution, which gives to the Legislature of the State the power to elect a United States Senator, and provides for appointment by the Governor to fill vacancies occurring during the recess of that body, provides for "temporary appointments until the next meeting of the Legislature." Such an appointment (until the next meeting of the Legislature) of a State officer is not permitted under our Constitution to the Governor, who alone has power to fill a vacancy in a State office.

The General Assembly, wherever named in the Constitution, is either authorized or directed to "provide by law" (secs. 136 and 147), to make "provision by law" (sec. 185), or to "provide by appropriate legislation" (sec. 183), for the purposes authorized by the Constitution; or, it is forbidden to pass an act as to some designated subject (secs. 59, 60); or, its power is limited as to certain matters, such as the laying out of new counties, removing of county seats (secs. 63, 64), and as to the exercise of various other functions uniformly recognized as parts of the legislative power. From this it seems clear that the makers of the Constitution intended the Legislature to discuss and enact laws, and to do nothing else.

If the Legislature may provide for the election by itself of these officers, it undoubtedly may, under section 107, which authorizes it to "provide for the election or appoint-

ment for a term not exceeding four years of such other county officers, or district, minsterial and executive officers, as may from time to time be necessary," elect all of the 350 county commissioners provided for in this law, and every other appointive officer in the Commonwealth. "The exercise of such power would," as said by the Governor in his veto message, "destroy the very object for which the legislative department was created."

Legislative sessions are limited in duration to a brief period. With a constantly increasing list of offices to be filled by that body, the time for the performance of legislative functions—for the discussion and enactment of laws—will be more and more encroached upon by the usurpation of administrative functions, and I look with dismay to the character of legislation we may expect under such circumstances.

It is not to be supposed for a moment that, in vesting the General Assembly with legislative power, it was imagined by the Convention or the people that that body, by the mere passage of a so-called act conferring upon itself powers which properly belonged to the other departments, could usurp their functions. If it can do so, then we do not live under a constitutional government, but the General Assembly, like the British Parliament, is supreme.

It was held in the George case, approved in the case at bar, that "the Legislature, unless inhibited by the Constitution" (and the opinion holds that there is no inhibition) "may exercise its power in either of the three modes: 1. It may by a statute create and name persons who are to fill it" (citing authorities); 2. It may by law create an office and provide that it shall be filled by election or appointment by the Legislature in joint convention assembled," etc., etc.

It may be remarked here that, in this law, the election or appointment was not provided for by the Legislature to be done *in joint convention assembled*. If the first proposition —which is of course mere dictum—be true, then the twenty-ninth clause of section 59, "In all other cases where a general law can be made applicable, no special law can be enacted," is a nullity; for the General Assembly could have provided that Judge Pryor and his two associates should, from and after a named date, be commissioners of election, which undoubtedly would have been a special law in a case where a general law could have been made applicable.

Moreover, this dictum is in direct conflict with the case of Clark v. Rogers (81 Ky., 44), in which, in an opinion by the chairman of the Board of Election Commissioners created by this act, it was held that the Legislature could not, without a local vote upon the question, when changing a town government by trustees into a city, continue the old trustees as councilmen under the new charter. Said Judge Pryor in that case:

"Under our elective system, by reason of the provision of the Constitution in regard to the election of officers for towns and cities, and other provisions of that instrument relating to State and county officers, the Legislature has no power to appoint to office, or to continue in office, such officers as by the provisions of the Constitution are made elective; and the attempt to exercise such a power by legislative enactment is in plain violation of its provisions. Section 10 of article 6 of the Constitution provides that "The General Assembly may provide for the election or appointment, for a term not exceeding four years, of such other county or district, ministerial and executive officers as shall from time to time be necessary and proper;' but officers required to be elected by the Constitution can not be

appointed to or continued in office by legislative enact-
ment, without consulting the popular will."

This opinion clearly holds that, even under the third
Constitution of this Commonwealth—far more loosely
drawn in regard to restrictions upon the powers of the
Legislature than the present Constitution—the Legisla-
ture, under a grant of power to provide for the election or
appointment of an officer could not itself elect or appoint
to the office, and this by virtue of a provision which is
copied in section 107 of the present Constitution.

It seems to me further, that the resolution to meet in
joint assembly, for the purpose of electing these commis-
sioners, was an "order, resolution or vote," within the
meaning of section 89 of the Constitution, which requires
that "every order, resolution or vote in which the concur-
rence of both Houses may be necessary, except on a ques-
tion of adjournment, or as otherwise provided in this Con-
stitution, shall be presented to the Governor, and, before
it shall take effect, be approved by him," etc., etc., and that
the meeting of the Houses in joint assembly was, there-
fore, unauthorized and ineffectual. A meeting in joint
assembly might have been provided for in the act itself,
but this was not done. Not being done, the resolution
to meet in joint assembly was an addition to the law
providing the means of its being put in operation, and
should have been submitted to the Governor.

But I do not care to take time in discussion of this and
a number of other objections which have been urged to the
act. By far the most serious and weighty objections to
the act, it seems to me, are its legislative usurpation of
executive power and function; its invasion of the right to
free and equal elections, guaranteed by section 6 of our
Bill of Rights, and its unwarrantable interference with

the principle of local self-government. In the opinion—
and (I say it with profound respect and loyal friendship
for the judge who delivered it) the books contain no abler
or more plausible defense of a vicious law. It is said: "It
is true honest elections are necessary to obtain a fair ex·
pression of the will of the people. But can this court de·
termine that an election law is unconstitutional and void
for the sole reason it does not provide for selection of
election officers of different political parties?" After stat·
ing that the three Constitutions prior to the present one
contained similar provisions for free and equal elections,
but that no statute requiring officers of election to be of
different political parties was passed until 1858, the opin-
ion continues: "So, if the argument of counsel be sound,
there was not a valid election law in this State until sixty-
six years after it was founded." To me it appears that
the right to free and equal elections, which is a right ex-
cepted out of the general powers of government, with a
provision that it "shall forever remain inviolate," and all
laws contrary thereto, or contrary to this Constitution,
shall be void—goes hand in hand with the principle of local
self-government, uniformly recognized both in the Consti·
tution and laws as a guiding principle in the government
of the Commonwealth. No unprejudiced man can compare
the former election law with the act under consideration,
examine the changes which the latter makes in the time-
honored requirement of direct responsibility to the local
community of the officer appointing election officers, and
consider the centralization of power provided for by the
new act in the hands of a State Board of Election Commis·
sioners selected by party caucus in the Legislature, be-
longing to the same political party, and invested with
power to appoint the county boards and remove at any

time, with or without cause, and to fill the vacancies thus made. No impartial man can compare the two acts and believe that free and equal elections are anything like as possible under the new as under the old law.

Judge Cooley says: "All regulations of the election franchise however, must be reasonable, uniform and *impartial*, they must not have for their purpose directly or indirectly to deny or abridge the constitutional right of citizens to vote, or *unnecessarily* to *impede* its exercise; if they do they *must be declared void.*" This language has been approved by this court in City of Owensboro v. Hickman (90 Ky., 635); Cooley's Con. Lim., 758; Capon v. Foster, (12 Pick., 483.)

This court, in Commonwealth v. McClelland (83 Ky., 688), said, commenting on this section of the Bill of Rights: "Elections are free and equal only when all who possess the requisite qualifications are afforded a *reasonable* opportunity to vote without being molested or intimidated, and when the polls are in each county and in each precinct alike freed from interference or contamination of fraudulent voters."

Nor is it an answer to this to say, as is said in the opinion of the majority: "And if it be said the county board owes its existence to the State board, composed wholly of members of one political party, it may be answered the county judge is usually elected with reference to his party affiliation. But the truth is neither the old or the new law could or does fully accomplish the object of wholly divesting the appointment of election officers from party bias or influence; and it would be difficult to frame a law that would do so. It would, therefore, be futile for this court, even if the subject was within its proper sphere, to pro-

[9]

nounce a statute void because defective in that respect, when the law thereby revised is little, if any, less so." With equal propriety it might be said that all Constitutions and statutes are finite, and that absolutely free and equal elections can be obtained only by the exercise of infinite power. That is true; but it may be replied that the Constitution does not contemplate divine impartiality, or absolute freedom and equality in elections. It was constructed, and should be construed, with regard to the limitations of human law. What was intended to be secured by this provision was the holding of elections *as free and as equal as human law can make them.* This being so, it follows inevitably that any statute which is a distinct departure for the worse—which is less reasonable, uniform and impartial than the law before in force; which alters that law so as, and with the purpose directly or indirectly, to deny or abridge the constitutional right of citizens to vote, or unnecessarily to impede its exercise—is void, under section 6 of the Bill of Rights. Grant that, under existing law, absolute freedom and equality in elections is impossible, still it is true that a law which makes freedom and equality therein more difficult of attainment than before its enactment comes within the inhibition of the section, and is unconstitutional and void.

It is said in the opinion that we may not "pronounce a statute unconstitutional and void because it may, in opinion of the court, be impolitic, unjust or oppressive, or because it appears to violate what might be deemed fundamental principles, or what is called the 'genius and spirit of our institutions.'" Fundamental principles, in this Commonwealth, are the principles of the Constitution. The genius and spirit of our institutions is the genius and spirit of the Constitution. And in this view we *may* in-

quire whether a statute will work injustice or oppression in denying free and equal elections, or as free and equal elections as can be compassed by the enactments of finite man.

The field of inquiry presented by this case is so wide that I have not attempted to cover it. I have but attempted to outline my views upon the subject. The objections to the act upon the ground that it invades the right of free and equal elections have been barely indicated. Its provisions are so plainly and so unmistakably vicious that they may be seen of all men who will take the trouble to compare the two laws.

For the reasons stated, and others which lack of time prevents me from stating, I dissent from the opinion of the majority.

Judge Burnam concurs in this dissenting opinion.