# Board of Penitentiary Commissioners v. Spencer, et al.

(Decided May 28, 1914.)

## Appeal from Franklin Circuit Court.

1. Constitutional Law—Title of Act—Section 51 of the Constitution Is Mandatory.—Section 51 of the Constitution reading, "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred shall be re-enacted and published at length," is mandatory, and its provisions must be substantially complied with.

2. Constitutional Law—Power of Court to Declare Law Unconstitutional.—The court is under a duty to declare an Act of the Legislature invalid when it is plainly forbidden by or conflicts with or violates some provision of the Constitution, but this power courts are reluctant to exercise and will not do so unless constrained by a strong sense of duty.

3. Constitutional Law—Act Violative of Section 51.—An Act of 1910 entitled "An Act to amend an Act entitled 'An Act to create a Board of Penitentiary Commissioners and regulate the penal institutions of this Commonwealth,' which became a law March 5, 1898," proceeded to amend the Act of 1898 by adding to it a new section, leaving the whole of the Act of 1898 in effect, but without republishing any part of the Act of 1898. This method of amendment was a plain violation of Section 51, which provides that no law shall be amended by reference to the title only, but that so much thereof as is amended shall be re-enacted and published at length.

4. Constitutional Law—How Section 51 of the Constitution May Be Complied With.—(A) It is not necessary when the body of the new Act repeals all or part of an existing Act to republish the parts repealed, although the title of the repealing Act may purport to be an amendment to the existing Act. (B) When it is proposed to amend or revise one or more Sections of the Kentucky Statutes or an Act, the body of the new Act should contain the section or sections as they will read when revised or amended, if it is proposed to re-enact or leave in force any part of the section or sections that are amended or revised. If,

however, it is intended to repeal one or more sections, then it is not necessary to set forth in the body of the Act the section or sections repealed.   (C) But when the Act does not purport to be an amendment to an existing law but a new Act, it is not necessary to set out or republish any part of any old law that may be changed or repealed by the new law.   (D) When the new Act purports to amend an existing Act by extending, revising or amending it, and no particular section or part of it is specified, then the body of the new Act must set forth the whole of the existing Act as it will appear when extended, revised or amended.   (E) When it is desired to confer or carry into a new law provisions of an old law, so much of the old law as is thus conferred or carried into the new law must be published at length.

JAMES GARNETT, Attorney General, M. M. LOGAN, Assistant Attorney General, for appellants.

HAZELRIGG. & HAZELRIGG, SCOTT & HAMILTON and GUY H. BRIGGS for appellees.

° OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellee, Louis Spencer, and several other convicts serving · terms of imprisonment in the Kentucky State Reformatory, in behalf of themselves and other convicts, brought this suit against the Board of Peni tentiary Commissioners, asking a mandamus to compel the board to set apart and place to their credit as convicts certain sums of money to which they asserted they were entitled under an act passed by the Legislature during the session of 1910.   The lower court granted the relief prayed for, and the Board of Penitentiary Commissioners appeal.

On behalf of the board several grounds are assigned why the judgment of the lower court should be reversed, but as we have concluded that the objection urged to the validity of the act under which the relief was sought and granted is well taken, it will not be necessary to do more than state the reasons that have influenced us in coming to this conclusion.

Section 51 of the Constitution provides: "No law enacted by the General Assembly shall relate to more than one subject, and that shall be expressed in the title, and no law shall be revised, amended, or the provisions thereof extended or conferred by reference to its title only, but so much thereof as is revised, amended, extended or conferred shall be re-enacted and published at length."

The objection to the act of 1910 is found in the failure of the Legislature to conform the act to the mandatory requirements of this section of the Constitution. The title of the act reads: "An act to amend an act entitled 'An act to create a Board of Penitentiary Commissioners and regulate the Penal Institutions of this Commonwealth,' which became a law March 5, 1898." The act then reads: "Be it enacted by the General Assembly of the Commonwealth of Kentucky: Section one: That an act entitled 'An act to create a Board of Penitentiary Commissioners and regulate the Penal Institutions of this Commonwealth,' be amended by adding after section one of said act the following." Then follows a section styled section 1a, providing in substance that the Board of Penitentiary Commissioners are authorized to convert one of the two penitentiaries into a penal institution to be known as the Kentucky Penitentiary in which shall be incarcerated all convicts of a certain class. In the other penitentiary, which was to be known as the Kentucky State Reformatory, there was to be incarcerated another class of convicts. After providing in another paragraph for the training and education of the convicts, the last paragraph, and the one involved on this appeal, authorized the board to place to the credit of each prisoner such an amount of the average per capita earnings of the inmates as the board might deem equitable and just, taking into consideration the character of the prisoner, the nature of the crime for which he was imprisoned, and his general deportment; the granting of this authority being followed by directions relating to the manner in which the fund accruing to the credit of the prisoners should be set apart and distributed.

Another paragraph authorized the board to enter into agreements with the contractors for the prison labor for such modifications of existing contracts as would enable the board to carry out the provisions of the act. Section two merely repealed all acts and parts of acts in conflict with the act.

At the threshold of what we have to say it might be well to observe that this court has no disposition to give a narrow or technical construction to the section of the Constitution under consideration, or a construction that would make it difficult or impracticable for the Legislature to phrase or construct titles or acts that would not be obnoxious to this provision of the Constitution. The

section should be liberally construed so as not to hinder or embarrass the Legislature in its efforts to enact laws, but at the same time a construction so loose as to virtually nullify the section, which is mandatory in its terms, should not be adopted.

The Constitution is not a technical instrument and should not be so construed as to defeat the substantial purposes of its adoption as the organic law of the State. It was intended to operate upon and regulate the practical matters that are continually presenting themselves in governmental affairs, and, generally speaking, the language employed is simple in expression and free from ambiguity. But of course when any of its sections are attempted to be applied to any one of the multitude of things constantly coming up, there naturally and reasonably come into existence, in company with these attempted applications, differences of opinion as to the meaning of certain provisions, and this unavoidable difference of opinion has given rise to much litigation. But this, in more or less degree, is true of every law that has ever been enacted as well as every contract dealing with private rights that has ever been written.

The section now under consideration, however, is so short and readily understood that it would seem not difficult to so construe it as to render it an easy matter for the Legislature to observe its provisions. But notwithstanding this, the number of legislative acts in which its provisions have been disregarded is surprising. Time and again this court has found it necessary to declare legislative acts invalid on account of fatal defects arising under this section, and time and again it has, with painstaking care, endeavored to point out the necessity for a substantial observance of its requirements and fully explained, if indeed explanation was necessary, how they might be complied with. So often has this been done that it would seem superfluous to repeat what has been said, especially in view of the fact that under all the opinions of this court this act must be adjudged insufficient.

It might also not be out of place to again observe that it is not either the duty or the pleasure of the court to interfere with the freedom of the legislative department or to attempt to control or restrain its activities, unless it appears that the legislation is forbidden by or conflicts with or violates some provision of the Constitution. We

fully appreciate the fact that the Legislature is at liberty, so far as the Constitution of the State is concerned, to enact such laws under such titles as its judgment dictates, subject to the single limitation that they do not disregard in some material way the restrictions imposed by the Constitution.  Except when it transgresses the bounds of its authority as marked out by the people in the Constitution, this court, in its judicial capacity, has no authority and no disposition to interfere with the Legislature of the State or to pass judgment on the propriety or wisdom of the laws that it may enact.

But to the judicial department of the State has been committed the authority to save the Constitution from being ignored or disregarded by individuals and collections of individuals, as well as by other departments of the government, and when it is made plain to the court that the Constitution has been ignored or disregarded, its duty to interpose its authority is as extensive as the exigencies of the case may require.

It is also true that this supervising power and large jurisdiction is not conferred by any express grant of the Constitution, but it has become so firmly established as a part of the jurisprudence of the State that no thoughtful persons can be found to question it.  It has been exercised by this court from the very beginning of the State, always, however, with reluctance, and never unless imperatively demanded by a sense of duty that could not be set aside without disregarding the obligations assumed on taking the office.

In the case of Bliss v. Com., 2 Lit., 90, decided nearly a century ago, this court said, in declaring an act unconstitutional: "It is emphatically the duty of the court to decide what the law is; and how is the law to be decided, unless it be known?  And how can it be known without ascertaining, from a comparison with the Constitution, whether there exists such an incompatibility between the acts of the Legislature and the Constitution as to make void the acts?

"A blind enforcement of every act of the Legislature might relieve the court from the trouble and responsibility of deciding on the consistency of the legislative acts with the Constitution; but the court would not be thereby released from its obligations to obey the mandates of the Constitution, and maintain the paramount authority of that instrument; and those obligations must cease to be

acknowledged, or the court become insensible to the impressions of moral sentiment, before the provisions of any act of the Legislature, which in the opinion of the court, conflicts with the Constitution, can be enforced.

"Whether on not an act of the Legislature conflicts with the Constitution is, at all times, a question of great delicacy, and deserves the most mature and deliberate consideration of the court. But though a question of delicacy, yet as it is a judicial one, the court would be unworthy its station, were it to shrink from deciding it, whenever in the course of judicial examination a decision becomes material to the right in contest. The court should never, on slight implication, or vague conjecture, pronounce the Legislature to have transcended its authority in the enactment of the law; but when a clear and strong conviction is entertained, that an act of the Legislature is incompatible with the Constitution, there is no alternative for the court to pursue but to declare that conviction and pronounce the act inoperative and void."

Again in Varney v. Justice, 86 Ky., 596, these well-expressed principles were set forth: "The Constitution of the State was adopted by the people of the State as the fundamental law of the State. This fundamental law was designed by the people adopting it to be restrictive upon the powers of the several departments of government created by it. It was intended by the people that all departments of the State government should shape their conduct by this fundamental law. Its every section was, doubtless, regarded by the people adopting it as of vital importance, and worthy to become a part and parcel of the constitutional form of government by which the governors as well as the governed were to be governed. Its every mandate was intended to be paramount authority to all persons holding official trust, in whatever department of government, and to the sovereign people themselves. No mere unessential matters were intended to be ingrafted in it; but each section and each article was solemnly weighed and considered, and found to be essential to the form of constitutional government adopted. Whenever the language used is prohibitory, it was intended to be a positive and unequivocal negative. Whenever the language contains a grant of power, it was intended as a mandate. Whenever the language gives a direction as to the manner of exercising a power, it was intended that the power should be exer-

cised in the manner directed, and in no other manner. It is an instrument of words, granting powers, restraining powers and reserving rights. These words are fundamental words, meaning the thing itself; they breathe no spirit except the spirit to be found in them. To say that these words are directory merely, is to license a violation of the instrument every day and every hour. To preserve the instrument inviolate, we must regard its words, except when expressly permissive, as mandatory, as breathing the spirit of command.''

Again in the late case of McCreary, Governor v. Speer, 156 Ky., 783, in holding an amendment to the Constitution, adopted by the people, invalid because the question was submitted to the people in a manner not authorized by the Constitution, we said: ''It is true our Constitution contains no provision to the effect that all its provisions are mandatory; but we deem this immaterial for the reason that this court has held before the adoption of the present Constitution that all the provisions of a Constitution are mandatory; and the Constitution must be presumed to have been adopted with this understanding of its meaning. Since the adoption of the Constitution the court has steadily maintained the same rule.''

In the many years that have passed between the decision in Bliss v. Commonwealth and the case of McCreary, Governor v. Speer, perhaps one hundred cases touching on this subject have been written, but in no one of them has there been any departure from the principles announced in Bliss v. Commonwealth and Varney v. Justice.

And it is in the spirit expressed in these cases and actuated by the conception of its power and duty as therein set forth, that this court has always approached the consideration of cases, which imposed upon it the necessity of setting aside a legislative act.

The title of this act expressly declares that it is ''An act to amend an act entitled 'An act to create a Board of Penitentiary Commissioners and regulate the Penal Institutions of this Commonwealth,' which became a law March 5, 1898,'' and then the act immediately proceeds to amend the act of March 5, 1898, by adding to it a new section styled ''1a,'' leaving the whole of the act of 1898 in effect. The Constitution expressly declares that no law shall be amended by reference to its title only, but that so much thereof as is amended shall be re-enacted

and published at length. This mere statement would seem sufficient to demonstrate that the title of this act flagrantly disregards the provisions of the Constitution referred to.

This proposition is so plain that the only argument advanced in support of the act is that the act is not in fact an amendment to the act of 1898, but is a new law entirely distinct from the act of 1898 and creates new rights and confers new authority, no reference to which was made in the act of 1898. Therefore, it is said the sufficiency of the act is not to be measured by section 51, but that the title, as well as the act, should be treated as new legislation.

The conclusive answer to this argument, it seems to us, is that the Legislature did not treat this act as a new act, but saw proper to style it an amendment to the act of 1898.

If the Legislature had, in a separate act, with an appropriate title, invested the Board of Commissioners with the authority conferred by this act, then the argument of counsel would be well sustained. But in determining what the Legislature intended to and did do, and for the purpose of ascertaining whether it intended to amend the old law or enact a new one, we must of necessity look to the title and the body of the act, and when we do this there is no difficulty in determining what the Legislature intended to and did do. It said in so many words that it intended to and did by this Act amend the act of 1898, and to further make plain this intention, it did amend the act of 1898 by a mere reference to the title of that act, without setting forth, as required by section 51, the act that was to be amended, or so much as a single word of it although all of it was left in force.

In view of this situation, the question is directly presented whether the Legislature can, in the broadest possible way, ignore section 51 of the Constitution and treat its requirements as of no moment. We must either uphold the act and say the Constitution does not mean what it plainly says, or else declare the act invalid. These are the only alternatives presented. If this act should be sustained, it is plain that the Legislature would not only be authorized but invited to amend by its title any act that it thought proper to so amend, and presently we would have the same situation that existed before the adoption of the present Constitution and that influenced that body

to incorporate into the present Constitution so much of section 51 as we are now considering.

To say that this act does not boldly violate section 51 would be to say that the words of the section have no meaning or effect and that a section of the Constitution, that in a number of cases has been declared mandatory, has no more force than a legislative act that each succeeding Legislature may amend or repeal at pleasure. A decision like this would virtually destroy the influence of the Constitution as a controlling guide and restraint upon the conduct of the people and their political agents and leave them free from the limitations that it imposes. This is putting the matter in a strong light and yet it is only stating that which a comparison of the act with the section of the Constitution shows to be true. This part of the section has of course no application to acts that do not purport to revise, amend or extend another act or law. When the Legislature comes to enact new laws under appropriate titles, its power is not in any manner limited by this provision, and it may act entirely independent of and without reference to it. Of course many laws that are enacted by the Legislature touch in some way existing laws either by amending, extending or repealing them, but notwithstanding this, the Legislature, by a new act that does not purport in its title or body to amend, revise or extend an existing law, may in fact revise, amend or extend it, free from the control or section 51, and this has been often done.

In Purnell v. Mann, 105 Ky., 87, in which was involved the validity of an act of 1898 entitled "An act to further regulate elections," it was insisted that the act was invalid because it did not conform to section 51 of the Constitution. At the time this act, which made radical changes in the general elections laws of the State, was passed, there was another law in force completely covering the subject of elections, and it was argued that as the act of 1898 made many radical changes in the existing law, it was in fact an amendment to the old law and should be so treated, and was therefore violative of section 51, because it did not re-enact and publish at length so much of the old law as was revised or amended. But the court rejected this view, saying:

"We think the manifest intention was that the provision should apply only to so much of the law as, after the passage of the new act, remains in force amended.

To construe it otherwise would involve an absurdity, for while a law, or part of a law, that is repealed, or for which a substitute has been adopted, might be republished, though to no purpose, it certainly was not intended it should simultaneously die and be re-enacted. * * * We have been referred by counsel to a number of cases sustaining Judge Cooley, but need not mention them, because satisfied that republication of a law then and thereby repealed is not required by section 51 of the Constitution. There is no direct reference made in the act in question to any particular section of the general election law amended or repealed by it, nor do we think section 51 expressly or impliedly requires it done."

Another instance is an act of 1908 entitled ''An act for the government and regulation of the common schools of this State.'' This act made radical changes in the existing school laws of the State, but it did not profess to amend, revise or extend any existing laws, and therefore did not come within the scope of section 51. Prowse v. Board of Education, 134 Ky., 365. Other examples are found in Herndon v. Farmer, 114 Ky., 200, and Murphy v. City of Louisville, 114 Ky., 762, in which the ruling of the court in Purnell v. Mann was adhered to.

In Commonwealth v. Reinecke Coal Mining Co., 117 Ky., 885, the title of the act considered read: ''That section one of an act entitled 'An act concerning the employes and servants in mining work or industry in this Commonwealth,' which was received by the Governor March 2, 1898, and became a law at the expiration of ten days without the Governor's approval, be, and the same is hereby, repealed, and the following is enacted in lieu thereof.'' The objection was made that this act did not comply with section 51, but the court said: ''The act of 1902 sets forth in explicit terms that section one of the original act is repealed, and that the single section constituting the amendment shall be and is substituted therefor. No other section or provision of the original act was amended by the act of 1902, and as section one, enacted in lieu of the one repealed, is set out in full—that is, 'published at length'—in the act of 1902, such publication was and is a substantial compliance with section 51 of the Constitution.''

It will be observed that in this case the Legislature merely repealed a section of an existing act and substituted in its place a new section, and it has never been

doubted that the Legislature may repeal one or more sections of a law and substitute in their place other sections without incorporating in the new act these repealed sections. This rule was also applied to sections of the Kentucky Statutes in Ex Parte, City of Paducah, 125 Ky., 510, where it was said with reference to a title reading "An act to amend and re-enact section 3140 of the Kentucky Statutes," "When the Legislature amends or repeals a section of the Kentucky Statutes, and the title of the repealing or amendatory act mentions the section affected, the members of the General Assembly can at once conveniently examine the statute and ascertain the nature of the amendment. * * * We, therefore, conclude that the intention of the constitutional provision will be fully carried out when the title of any act calls attention to the section or chapter of the Kentucky Statutes to be repealed or amended."

Again in Commonwealth v. McNutt, 133 Ky., 702, it was urged that an act entitled "An act to amend section 1214, of the Kentucky Statutes," was invalid because the title was not sufficient, but the court held the title good, as the act set forth section 1214 as it would read when amended.

In Flynn v. Barnes, 156 Ky., 498, the title of the act read: "An Act to amend section 4425, of the Kentucky Statutes, relative to the examination of teachers for county and State certificates and State diplomas," and following the Paducah case and the McNutt case, the court said the title was not obnoxious to section 51, holding that the act of 1906 was a substitute for and repealed section 4425. As said by the court, "The act shows on its face an intention not to add words to the existing section, but to change the section so as to make it read as herein set out," and that therefore it was not necessary to re-enact or publish at length the sections that were repealed.

In Commonwealth v. Burk's Springs Distilling Co., 125 S. W., 306, the title of an act passed by the Legislature in 1908 read, "An act to amend an act entitled 'An act to regulate the sale of intoxicating liquors by wholesale in this Commonwealth,' which was approved March 22, 1904, and amended by an act approved March 21, 1906." The act of 1908 in its body did not set out the act that was amended, but it provided that, "Said Act as amended shall read as follows," and then followed the

amendatory act. This legislation was assailed upon the ground that it violated section 51. But we said: "The act in question does not purport to amend the acts of March 22, 1904, and of March 21, 1906, by reference to their titles only; but so much of those acts as is amended is re-enacted and published at length."

In Mark v. Bloom, 141 Ky., 474, the title of the act was in these words: "An act to amend the school laws and to create boards of education, and to define their duties in cities of the first class." This act made radical changes in the existing school laws and the title was held not to offend section 51 because, as said by the court, "The act deals with a 'subject, the creation of a board of education, and the defining of its duties. The Legislature may select a subject of this sort and deal with it in one act without incorporating into the act all the existing laws touching the subject." In other words, the court treated this act as a new law repealing a number of provisions in existing laws, and said that it was not necessary to incorporate into a new law sections of the old law that had been repealed.

In Bryan v. Voss, 143 Ky., 422, the title of the act read: "An act to amend an act entitled 'An act for the government of cities of the second class in the Commonwealth of Kentucky,' which was approved March 19, 1894, and thereafter in due course became a law, and as same has since been amended, all of which said act and amendments now appear as article 3 of Chapter 89 of the Kentucky Statutes, in John D. Carroll's Edition thereof in 1909."

The validity of this act was assailed upon the ground that the title violated section 51. But the court, treating the act as one intended to establish a new form of government for cities of the second class in place of the existing form, and as repealing, when it became effective, all previous laws in conflict with it, said that it should be regarded as "if the title to the act had read 'An act to further regulate the government of cities of the second class.'"

It may be conceded that in Bryan v. Voss and in Mark v. Bloom the court came near giving its approval to acts the title of which violated section 51, and yet it was careful to recognize in each of these cases the mandatory nature of section 51 and to put its decision upon the ground that the acts in these cases, although purporting to be

amendatory, were in fact new laws that were intended to and did repeal existing laws.

Adopting the view upon which the court in these cases sustained the validity of these acts, they may be well distinguished from the question as presented in this case, because the Act of 1910 is not and did not profess to be a substitute for the act of 1898, nor did it undertake to repeal or repeal any part of that act. It simply amended it by adding to it, leaving the Act of 1898 undisturbed except in so far as it was added to by the Act of 1910. It is therefore clear that this act cannot be sustained upon the ground that the acts in the two cases last mentioned were sustained. Indeed there is no ground upon which this act can be upheld, except the single ground that section 51 of the Constitution does not mean anything.

It was said in argument by counsel on both sides of this case that the decisions of this court in the construction of this section were, in material respects, harmonious, and this statement is, we think, fully supported by the decisions we have referred to, which include all that have been handed down on this subject. Here and there in these opinions there may be found expressions apparently in conflict with expressions in other opinions, and in some of them the acts assailed as violating it were sustained upon one ground and in others upon another; but, running through all of them will be found the determined purpose of this court to enforce substantial compliance with this section while giving to it a reasonable and liberal construction.

The effect of the decisions when considered as a whole is: a. That it is not necessary when the body of the new act repeals or has the effect of repealing all or part of an existing act, to republish or set forth the parts repealed, although the title of the repealing act may purport to be an amendment to the existing act. b. That when it is proposed to revise or amend one or more sections of the Kentucky Statutes, or an act, the body of the new act should contain the section or sections as they will read when revised or amended, if it is proposed to re-enact or leave in force any part of the section or sections that are amended or revised. If, however, it is intended to repeal one or more sections, then it is not necessary to set forth in the body of the act the section or sections repealed. c. That when the act does not purport to be an amendment to an existing law, but a new act, it is not necessary to

set out or republish any part of any old law that may be changed or repealed by the new law. d. When the new act purports to amend an existing act by extending, revising or amending it, and no particular section or part of it is specified, then the body of the new act must set forth the whole of the existing act as it will appear when extended, revised or amended; but if only a section or several sections of an act are extended, revised or amended, it is only necessary to specify and republish the section or sections that are extended, revised or amended. e. That when it is desired to confer or carry into a new law provisions of an old law, then so much of the old law as is thus conferred or carried into the new law must be published at length.

These very liberal rules, gathered from the opinions cover, as we think, every aspect in which the construction of that part of section 51 now under consideration can be presented, and the act in question cannot be sustained under any of them. It purported to and did amend another act by its title, not republishing any other part of it, without specifying the part proposed to be amended and without repealing or intending to repeal any part of the act that was amended.

Passing now for a moment to the reasons why this provision was inserted, it will be noticed that the section uses the words "revised, amended, extended or conferred," and the purpose of using these words, when perhaps fewer would have answered, was to make plain the meaning and purpose of the section, and to make sure that no evasion of its provisions could be resorted to. If only the word amended had been used, it might be said that the extension of a section was not an amendment to it; or that the revision of a law by correcting it was not an amendment, however little foundation there might be for assertions like these. And so, too, the use of these several words can be better understood by one who has taken occasion to look through the acts of the Legislature previous to the adoption of the present Constitution. In these acts will be found numerous laws that were revised, amended and the provisions thereof extended or conferred by a mere reference to the title of some other act. For example, it was a common practice to create a private corporation and merely provide that it should be vested with all the powers and privileges and rights and liabilities conferred on similar cor-

porations, or on some like corporation named in the act, without attempting to set forth in the act the powers or privileges or rights or liabilities of the corporation created, or that were conferred on it by the reference to the other corporation.

The word "conferred" can be found in great numbers of these local acts in which was conferred upon the corporation created the powers and privileges of some other corporation. Under the legislative custom, recognized as legitimate and upheld as lawful under the old Constitution, it was also a common practice to amend or revise sections of existing laws by adding certain words to the existing law, or by repealing certain words in the existing law, and to extend the provisions of an existing law by adding to it certain words or certain sections, without, in any instance, setting forth the law as it would appear when thus amended or revised.

It can readily be seen that under this practice no person, by reading an act, the provisions of which had been extended or conferred in the manner indicated, could obtain any idea of the meaning or effect of it without reading it in connection with the old law, the provisions of which had been carried into the new law, by reference to the title of the old law; nor could any person, by reading an old law that had been revised or amended by adding to it certain words or taking from it certain words, understand the meaning and effect of the old law without reading it in connection with the new one that amended or revised it in this manner. And it was largely to prevent this deceptive and misleading manner of legislating, which afforded so many opportunities for fraud, as well as to make the laws more convenient and accessible, that this section was adopted. As aptly said on this subject by Mr. Spalding, the chairman of the Legislative Committee, in volume three, page 3792 of the Debates of the Constitutional Convention:

"The members of the General Assembly did not know what they were voting for half the time, and this section in the report provides when an act is amended it shall not be amended in that way, but that the act, as amended, shall be set out in full, so every man will understand what it is when voting on it, and the people will know what change has been made when they see it."

This was the whole purpose of this provision in the Constitution, and that it is a wise provision is not open

to doubt. When any person, lawyer or layman, takes up an act of the Legislature, to read and understand what changes have been made in an old law, he ought to have before him in the act that he is reading the whole of the law as it appears when amended or revised by the new act, and so the convenient and the proper way to revise or amend an old law, by either adding to it or taking from it or extending its provisions, is to set forth in the new act the law as it will read when revised, amended or extended. It is not, however, indispensable that the old law as it read before being revised, amended or extended should be also set forth, although it would manifestly be more convenient if this were done, so that the new law would show not only the old law but the changes that were made in it by the new one.

With these expressions of our views, it follows that the judgment of the lower court must be reversed, with directions to dismiss the petition, and it is so ordered. The whole court sitting.