## In re GRAHAM.
### No. 11876.

District Court, W. D. Kentucky, Louisville Division.

Feb. 19, 1938.

234

M. M. Hellmann, of Louisville, Ky., for Howard Joseph Graham, bankrupt.

John P. Fleming, Norman Curtis, and Herman Cohen, all of Louisville, Ky., for R. S. Motte & Co., objecting creditor.

HAMILTON, District Judge.

This case is pending before the court on exceptions of R. S. Motte & Co., one of the bankrupt's creditors, to the special master's report overruling objection to his discharge.

Within four months before the bankrupt was so adjudged, he borrowed from R. S. Motte & Co. $451.81. It was engaged in the small loan business and, before making loans, required each applicant to answer numerous questions on a form provided by the company, one of which reads as follows: "What other debts do you owe?— Give a complete list."

It is claimed by the objecting creditor that the bankrupt, in answer to this question, listed indebtedness totaling $503.51 when in fact he was indebted to various creditors in the sum of $1,693.50. The objecting creditor made an investigation through credit rating agencies before making its loan and ascertained that the applicant did owe creditors other than those listed.

The special master found that the creditor did not rely exclusively on the statement made by the bankrupt about his indebtedness before making the loan and that it had notice his statement was incorrect before it accepted the bankrupt's note and extended credit to him. The special master recommended that the creditor's objections be overruled and the bankrupt granted his discharge. The creditor has excepted to the master's conclusions.

The bankrupt, on July 2, 1936, executed to the objecting creditor his note for $451.88 with John K. Birk as joint maker, and bearing interest at the rate of 6 per centum per annum, and agreed to repay it, $25 on August 5, 1936, and $25 on the 5th day of each month thereafter until February 5, 1937, after which date he agreed to pay $50 per month until the note was discharged. As a condition precedent to the making of the loan by the R. S. Motte Company, it required the applicant to apply for and procure on his life an insurance policy for the principal sum of $4,500 payable to his wife, and on which there was a premium of $151.88. The lender was the agent for the insurance company and deducted the above premium from the proceeds of his note.

It is claimed by the bankrupt that the loan of the complaining debtor was usurious to the extent of $151.88, the premium on the policy, and that his actual indebtedness to it was $299.73. The bankrupt was indebted to fifteen creditors at the time he made his application, only two of whom were listed. He filed his petition August 4, 1936, and had paid nothing on the note of the R. S. Motte Company at the time he was adjudged a bankrupt.

■ 11 U.S.C.A. § 32, provides that any person may, after the expiration of one month and within twelve months subsequent to being adjudged a bankrupt, file an application for discharge in the court of bankruptcy in which the proceedings are pending and, after hearing on the application of the bankrupt if objections are made, the court is authorized to grant the discharge unless, among other things, it be shown that the bankrupt "obtained money or property on credit, or obtained an extension or renewal of credit, by making or publishing, or causing to be made or published, in any manner whatsoever, a materially false statement in writing respecting his financial condition."

It is further provided: "That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this paragraph (b), would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

The bankrupt in his testimony offers no reasonable explanation for failing to disclose to the Motte Company at the time he negotiated the loan the names of all of his creditors and, while it appears from the evidence that the company made an independent inquiry of his financial condition and ascertained he was indebted to others than those named, this is insufficient to relieve the bankrupt of the burden resting on him. It does not overcome the fact that the objecting creditor partially relied on his written statement in advancing him credit.

■ The burden rests on the objecting creditor to show: (1) The bankrupt obtained money or property on credit; (2) that he did so on a materially false statement concerning his financial condition; (3) that such statement was in writing; (4) that it was so made for the purpose of obtaining credit, or an extension or renewal; (5) that the creditor substantially relied on the false statement in giving credit.

■ It was not the intention of the Congress to prohibit a discharge in all cases of false written statements where credit was extended, but the statute is confined to cases where the decision to give credit was induced by false statements or, in other words, that the false statement was the moving or contributing cause for the extension of credit. An omission of substantial liabilities from a statement as to financial condition constitutes a materially false statement. In re Fackler, D.C., 246 F. 864; In re Maaget, D.C., 245 F. 804.

It has been said: "That he who has once deviated from the truth usually commits perjury with as little scruple as he would tell a lie."

■ Courts should be slow to lend the cloak of justice to conceal a falsehood. I am of the opinion that, if the court should approve the petition of the bankrupt for a discharge, it would be lending respectability to his deceit.

The exceptions filed to the recommendation of the referee will be sustained and the bankrupt's petition denied.

The bankrupt has not properly raised the question of usury, but I have concluded to pass upon it because of its importance.

The bankruptcy docket of this court is clogged with cases of wage earners led into credit quagmires by high-pressure methods of installment salesmen and small loan companies, and the bankruptcy court is the only place of refuge they may find from their pursuing creditor with his garnishments, attachments, threatening letters, and other instruments of oppression.

The most spectacular and novel development in the field of credit in the United States in the past ten years is the growth and variety of forms of consumers' borrowing. There are no accurate facts available showing the amount of consumers' credit, but it undoubtedly represents a high percentage of all sales of consumers' durable goods, and, when there is added the buying of homes and automobiles on the installment plan, the effect such credit has on the economic structure must be readily apparent.

The expansion of consumers' credit to the extent of great disparity between income and debt, and, in addition, the excess growth of all credit, both public and private, carry their own danger signals to our present economic system and, unless the real laws of credit are properly understood and followed, we may wreck our entire economic structure and destroy our capitalistic system.

The individual of the present day is met with many changing sanctions, some of them as follows:

"The lingering Puritan tradition of abstinence which makes play idleness and free spending sin; and the increasing secularization of spending and the growing pleasure basis of living.

"The tradition that rigorous saving and paying cash are the marks of sound family economy and personal self-respect; and the new gospel which encourages liberal spending to make the wheels of industry turn as a duty of the citizen.

"The deep rooted philosophy of hardship viewing this stern discipline as the inevitable lot of men; and the new attitude towards hardship as a thing to be avoided by living in the here and now, utilizing installment credit and other devices to telescope the future into the present.

"The tradition that the way to balance one's budget is to cut one's expenses to fit one's income; and the new American 'solution' by increasing one's income to fit one's expenditures.

"The increasingly baffling conflict between living and making money in order to buy a living; and the tendency, public and private, to simplify this issue by concentration on the making of money."

The lender renders a disservice to the borrower if there is no reasonable prospect of repayment. Under such circumstances, the day of economic distress is only postponed. Payday comes with additional burdens of excess interest and carrying charges.

Sometimes judges observe the letter and overlook the spirit of the law. From ancient times, it has been recognized by every nation having a financial or commercial structure that the hand of the lender could easily become that of the oppressor, and laws have been enacted prohibiting an excessive charge for the use of credit.

On loans in excess of $300, the laws of the Commonwealth of Kentucky limit interest to six per cent. See Carroll's Kentucky Statutes, 1936 Edition, § 2218. All contracts and assurances made directly or indirectly for the loan or forbearance of money or other things of value at a greater rate than legal interest are void for the excess. Carroll's Kentucky Statutes, 1936 Edition, § 2219.

By an act of the General Assembly of the Commonwealth of Kentucky of 1918, the usury statute was amended permitting insurance companies, as a condition precedent to a loan, to require the applicant to insure his life or that of another or his property with such company and assign the policy to the company as security for the loan. The title to the act reads: "An Act to amend an act approved December 3, 1892, entitled 'An Act relating to interest and usury.'"

See the Acts of the General Assembly of the Commonwealth of Kentucky 1918, c. 16, p. 53.

The Court of Appeals of Kentucky has not sustained the validity of this act. Section 51 of the Constitution of the Commonwealth of Kentucky provides that an amendatory act must set forth the whole of the existing act as it will appear when extended, revised, or amended, and, under this section, the act is void. See Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, 268, 166 S.W. 1017.

Its constitutionality, however, is not material to the question here. It does show

that the General Assembly of the Commonwealth of Kentucky assumed that section 2219 of the Statute, supra, would be violated by the exaction of a life insurance premium as a part of the consideration for a loan if the premium exceeded the statutory rate of interest.

It will be presumed that, when a statute is amended excluding from its provisions, things not specifically mentioned, they were included before amendment. Eversole v. Eversole, 169 Ky. 793, 185 S.W. 487, L.R.A.1916E, 593; Louisville & Nashville Railroad Company v. Mottley, 219 U.S. 467, 469, 31 S.Ct. 265, 55 L.Ed. 297, 34 L.R.A., N.S., 671.

Applying the above rule of statutory interpretation, the exaction of an insurance premium as a part of the consideration for lending money would be a violation of the Kentucky usury statute.

When it is made to appear (1) That there is a loan or forbearance, either express or implied; (2) a loan or forbearance of money or something circulating as such; (3) an understanding between the parties that the principal shall be repayable absolutely; (4) the exaction of a greater profit than is allowed by law, and (5) an intention to violate the law, all elements of usury are present. All these elements are present when a contract for the loan of money and an agreement for insurance upon the life of the borrower are blended together in one and the same transaction, and the facts show the policy of insurance was taken and the premium paid in advance in consideration of the loan and that such consideration was over and above the interest allowed by law.

The above statement does not have the unanimous support of all the courts that have been called upon to enunciate the rule. They are annotated in 21 A.L.R. p. 876. I am of the opinion that the cupidity of lenders and the necessity of borrowers are so great that the courts should be diligent in searching and weeding out hidden illegal exactions in contracts of lenders of money.

The bankrupt executed his note for $451.88. He was deeply indebted at the time of the loan, and the lender knew he was indebted to another loan company. His financial condition was such it was impossible for him to pay an annual premium of $151.88 on life insurance. The lender was the agent for the insurer, and, while there is no proof in the record as to what part of the premium it received, the court may take judicial notice of the well-known business practice that the agent receives the greater part of the first premium.

In this case the payments which have been made under the name of premiums on the insurance policy must be regarded as paid on account of the loan because the insurance contract was made as a cover for usury and is void. The claim of the objecting creditor, R. S. Motte & Company, will be reduced to $299.73, with 6 per cent. interest thereon from July 2, 1936, until paid.

The attorneys for the parties will prepare conclusions of law and findings of fact in accordance with this opinion.