FOURNET, Chief Justice.
 

 The City of New Orleans, availing itself of the provisions of Louisiana’s Uniform Declaratory Judgments Act, Act No. 22 of the Extra Session of 1948, instituted this proceeding to have Act No. 234 of 1948 declared unconstitutional and, in the alternative, declared repealed by Act No. 351 of the same session of the legislature. In the same suit the city seeks to enjoin the Board of Supervisors of Election in and for the Parish of Orleans, and its individual members, from undertaking to conduct the general election for Mayor and Commission Councilmen for the City of New Orleans in 1950 as provided in this act. The Attorney General of Louisiana was made a party to the suit under the provisions of the declaratory judgments act.
 

 
 *123
 
 For cause of action the city alleges, brief; ly and substantially, that Act No. 234 of 1948 violates the following sections of the Constitution of 1921: (1) Section 16 of Article III, its title not being indicative of its object because it (a) purports to amend and re-enact Sections 9 and 12 of Act No. 159 of 1912, as amended by Act No. 338 of 1936 as amended by Act No. 301 of 1946, while the title indicates the amendment and re-enactment of these sections only as amended by Act No. 338 of 1936, (b) proposes to make certain of its provisions effective at the termination of the present term of office held by the incumbent public officials, without any indication thereof being in the title, and (c) undertakes to change the form of government from commission to aldermanic although such object is not only not indicated in the title, but the title is actually misleading and deceptive; (2) Section 17 of Article III because it purports to amend and re-enact subparagraphs (i) and (k) of Section 4 of Act No. 159 of 1912 without this section being reenacted and published in its entirety; (3) Section 3 of Article XIV because it fails to provide alternative forms of government for the
 
 Parish
 
 of Orleans; and (4) Section 22 of Article XIV because it deprives the electors of New Orleans of the right to choose their public officers. The city asks, in the alternative, that we hold Act No. 234 of 1948 was repealed by the enactment of a subsequent statute at the same session ■of the legislature, i. e., Act No. 351.
 

 In response to the rule to show cause why the preliminary'injunction should not issue, the board and its individual members filed numerous exceptions, all of which were overruled by the trial judge, and the application for a preliminary injunction was referred to the merits. The defendants were then given ten days in which to answer.
 

 Reserving their rights under their exceptions, all of which were reurged, they answered, contending the plaintiff, not an elector-of the city and without right to participate in choosing its own public officers, could not be affected by the constitutionality vel non of Act No. 234 of 1948. Further, that if the bringing of this suit in the name of the city was authorized by its mayor and commission councilmen, which was denied, then that said officers exceeded their lawful powers.
 

 After trial on the merits the trial judge,
 
 in
 
 a lengthy written opinion, considered all of the attacks the plaintiff levelled at the constitutionality of Act No. 234 of 1948 except that raised in 1-b, ruling against its constitutionality on two grounds, i. e., that it.contravenes the provisions of Section 16 of Article III, as set out in 1-c, and of Section 22 of Article XIV, as set out in' 4. Accordingly, he enjoined the board from calling or conducting an election thereunder.
 

 The defendant board, and its component members, having been refused a suspensive appeal from this judgment, were granted
 
 *125
 
 an appeal by us under our supervisory jurisdiction. No. 39,523 on the docket of this court. In answer to this appeal the city reurges all of its attacks upon the constitutionality of Act No. 234 of 1948, as well as its alternative plea that this act was superseded by Act No. 351 of the same session.
 

 Although the appellants are also re-urging most vigorously all of their exceptions to the rule issued against them to show cause why the injunction should not have been issued in this case, we have concluded to pretermit these exceptions and pass to the merits since this case involves issues that must be disposed of as expeditiously as possible in order that the primaries nominating those who will seek election as the city’s officials may be timely and orderly held prior to the general election in April of 1950.
 

 We will treat first of the trial judge’s conclusion that the act is unconstitutional because, in providing for the election of seven commissioners by the electors of the respective municipal districts they will represent, all of the people of New Orleans are deprived of the right to elect all of their public officials, in contravention of the home-rule clause of the constitution to be found in Section 22 of Article XIV, the pertinent part of which declares: “The electors of the City of New Orleans and of any political corporation which may be established within the territory now, or which may hereafter be embraced within the corporate limits of said city, shall have the right to choose their public officers.”
 

 It is well to mention at the outset that as a general principle “municipal corporations hold and exercise their powers subject to legislative control, and it has been laid down as a broad rule that the legislative authority over the civil, political, and governmental powers of municipal corporations is supreme except as limited by the state and Federal Constitutions.” 37 Am.Jur. 589, Section 76. See, also, 1 McQuillin 509, Section 3.02; 19 R.C.L. 700, Section 11; 43 C.J. 77, Section 17; 62 C.J.S., Municipal Corporations, § 6; State ex rel. Davis v. Stuart, 97 Fla. 69, 120 So. 335, 64 A.L.R. 1335; Edwards v. Town of Ponchatoula, 213 La. 116, 34 So.2d 394; and Pyle v. City of Shreveport, 215 La. 257, 40. So.2d 235. And as pointed out by McQuillin. in his work on “Municipal Corporations,” the general rule is also that “in the absence of restrictions in the constitution of the state, the charters of all public corporations, including incorporated cities and towns, are always subject to legislative amendment or alteration and repeal. Thus, unless prohibited by the constitution, the legislature,
 
 within its discretion and with or without the consent of the community af
 
 fected, may create new corporations, reincorpórate existing municipalities, revise, amend, or even repeal any and all of the existing charters and impose new ones.” 2 McQuillin 543, .Section 9.24. (Italics ours.)
 

 
 *127
 
 It is to be observed from a study of the several constitutions of this state since its admission into the Union in 1812 that they all contain a so-called home-rule clause or provision for the City of New Orleans which, for the purpose of this decision, is similar to the one in the Constitution of 1921. Yet, with the exception of the period from 1870 to 1882, when the city was operated under a form of government that closely resembled a commission form of government although the officials were called “administrators,” the city was under an aldermanic form of government from the time of its original incorporation until the adoption of Act No. 159 of 1912, the act amended and re-enacted by Act No. 234 of 1948.
 

 New Orleans was first incorporated by the Legislative Council of the Territory of Orleans in 1805, Chapter 12, prior to Louisiana’s admission into the Union. Under this act the administrative and executive functions of the city government were placed in the hands of a mayor and a recorder appointed by the then governor of the territory while the legislative functions were performed by a City Council composed of 14 aldermen, 2 elected from each of the 7 wards then composing the city. The recorder was the ex-officio president of this council but he had no power to vote, and although the mayor was given the right to express his approval or disapproval of the enactments of the Council, its by-laws and ordinances could be given the force of law by the Council despite the mayor’s objection.
 

 The city continued to operate under this same form of government with but slight change, Act No. 39 of 1827 divided the city into 8 wards but reduced the number of aldermen to 10, until 1836, at which time the legislative body in its Act No. 11 divided New Orleans into three distinct and separate municipalities, the affairs of each being administered by a council composed of a recorder and a specified number of aldermen, all elected. There was also a Mayor of the City of New Orleans elected from the three municipalities as a whole. It is interesting to note that the home-rule provision in the Constitution of 1812, the constitution in force when this legislation was enacted, guaranteed that “The citizens of the town of New-Orleans shall have the right of appointing the several public officers necessary for the administration and the police of the said city, pursuant to the mode of election which shall be prescribed by the Legislature; Provided that the may- or and recorder be ineligible to a seat in the general assembly.” Section 23 of Article VI.
 

 This form of charter remained in existence until 1852 when the General Assembly of that year by its Act No. 71 united these three municipalities into one whole and divided the city into 9 wards. This time the legislative powers were vested in a board of 11 aldermen and a board of 23 assistant aldermen. Together these formed
 
 *129
 
 what was known as the Common Council, each ward being entitled to a specified number of aldermen and assistant aldermen, all of whom were elected by the voters of their respective wards. The executive power of the city was vested in a mayor, three recorders, a treasurer, a comptroller, a surveyor, a street commissioner, and such other subordinate officers as the Common Council deemed necessary, all of which officials were elected. The changes made to the form of government set up under this charter were slight.
 

 Act No. 7 of 1870 increased the area of New Orleans by consolidating it with the City of Jefferson and, in incorporating it divided it into 6 districts. Under this new charter New Orleans was governed by a mayor and seven men who were termed “administrators,” being known as the administrators of finance, commerce, improvements, assessments, police, public accounts, and water-works and public buildings. These men were given “administrative and executive functions,” and, in addition, had full power and authority to “make and pass such by-laws and ordinances as are necessary and proper.” They were elected at large and, together, formed what was termed the Council of the City of New Orleans. Thus, for the first time since its original incorporation, the aldermanic form of government was abandoned in favor of one more nearly resembling the commission form.
 

 This change was rather short-lived. By Act No. 20 of 1882 the city was again incorporated. This time the legislative power was vested in a council composed of 30 members, elected in named proportions from what were termed 15 “representative districts” into which the city’s then 17 wards were divided. This council had the power “to pass such ordinances and to see to their faithful execution as may be necessary and proper.” The executive department consisted of a mayor, a treasurer, a comptroller, and two commissioners, one of public works and one of the police and public buildings. These officials were elected by the people at large. The change.made by Act No. 45 of 1896 was slight, the legislative power being vested in a council composed of 17 members elected by the voters of the respective “representative districts” into which the city had been divided by the act of 1882. At this time the executive department consisted of a mayor, comptroller, and treasurer, elected by the people at large,, and a commissioner of public works, a commissioner of-police and public buildings, and an engineer, all appointed by the mayor by and with the consent of the council. Act No. 216 of 1902 provided that the number of councilmen to be elected in November of 1904 should be increased to 21 and that they should be elected from the city’s 7 municipal districts, made up of the city’s 17 wards. Some of these councilmen were elected from the districts at large and some from certain of the wards composing the
 
 *131
 
 districts. The corporation’s executive powers were vested in the same officers as previously, with the exception that all of these offices were made elective.
 

 The next marked change in the structure of the city government occurred in 1912, when Act No. 159 vested all of the executive, administrative, and legislative powers and duties in a mayor and four commission councilmen, who were elected at large. The legislative powers were to be exercised by these 5 men when acting as a body termed a Commission Council while the executive and administrative powers were distributed among the commissioners heading the 5 departments of the city government set up in the act, i. e., the departments of public affairs, public finances, public safety, public utilities, and public property. The powers and duties embraced in each of these departments, except as otherwise provided in the act, were to be determined by the council itself at its first meeting after election.. In this same charter, however, the legislature kept intact the Public Belt Railroad Commission as it then existed under previous legislation, and, in addition, created a number of other boards that were to have control respectively of the police, fire, health, and civil service. It also created a recorder’s court to handle the city’s judicial functions.
 

 We think, therefore, that the so-called home-rule provision'to be found in Section 22 of Article XIV of the Constitution of 1921, when considered in the light of the history of the government of the city under the several acts of the legislature adopted pursuant to the provisions of the several constitutions that have been drafted since Louisiana’s admission into the Union in 1812, in all of which similar provisions are to be found, clearly shows the drafters of this constitution simply intended the officers controlling the ordinary governmental functions of the City of New Orleans (with those exceptions noted in the same section that have no application here) should be choosen or elected by the electors of the city rather than be appointed by the governor or entitled to hold office in some other manner that might be prescribed by the legislature under its plenary powers. This home-rule provision was never intended as a restraint upon the legislature’s unquestioned right to designate the system of government under which New Orleans as a municipality is to function, nor to prohibit the legislature from designating the number of officers that are to administer its government and the manner or mode by which these offices are to be filled, so long as the electors of the city are not deprived of their right to choose them.
 

 The authorities from other jurisdictions relied on by the trial judge as the basis for his conclusion, and those relied on by the attorneys for the city, are neither pertinent nor applicable here from a factual or legal standpoint and to discuss them would Serve no useful purpose.
 

 
 *133
 
 Turning now to the trial judge’s conclusion that Act No. 234 of 1948 is unconstitutional because it contravenes Section 16 of Article III, we find this section makes it mandatory that “Every law enacted by the Legislature shall embrace but one object, and shall have a title indicative of such object.”
 

 A provision similar to this “Every law enacted by the legislature shall embrace but one object, and that shall be expressed in the title” first appeared in the Constitution of 1845 as Article 118. The Supreme Court of the United States, commenting upon the reason for its enactment in the case of State of Louisiana v. Pilsbury, 105 U.S. 278, 26 L.Ed. 1090, says: “Its object is to prevent the practice, common in all legislative bodies where no such provision exists of embracing in the same bill incongruous matters, having no relation to each other, or to the subject specified in the title, by which measures are often adopted without attracting attention, which, if noticed, would have been resisted and defeated. It thus serves to prevent surprise in legislation.”
 

 In Succession of Pipitone, 204 La. 391, 15 So.2d 801, 804, this court, referring to Section 16 of Article III of the constitution says that it “does not require that every change which an act of the Legislature may effect in other laws on the subject shall be expressed in detail in the title of the new act. It requires merely that the title of the act shall be appropriate to the subject dealt with in the act itself, and shall not be misleading as to any purpose intended to be accomplished by the act. * * It is too well established by the jurisprudence to need citation of the decisions that a title which fairly indicates the subject dealt with in an act of the Legislature, and which cannot deceive or mislead anyone reading the title of the act, is a sufficient compliance with the requirement that the title shall be indicative of the object of the act.”
 

 So, where the object of an act is fairly expressed in its title, this requirement of the constitution is fully satisfied.
 

 There is no question but that the title of Act No. 234 of 1948 clearly indicates its object is to amend and reenact certain sections and subsections of Act No. 159 of 1912, the act incorporating the City of New Orleans and providing a commission form of government for the administration of its affairs.
 

 The learned trial judge, while recognizing our basic law with .respect to this constitutional provision is as above set out, concludes, nevertheless, that the act is unconstitutional because its title not only fails to indicate its object, but is actually deceptive, in that its title declares its object is to continue the commission form of government for the city, as provided for in Act no. 159 of 1912, while the body of the act actually establishes an aldermanic form of government.
 

 
 *135
 
 In order to properly dispose of this issue, it is necessary to show the characteristic features that distinguish these two forms of municipal government.
 

 Under the aldermanic form of government, the executive and administrative affairs of the city are generally in the hands of an executive officer, usually a mayor, and the legislative power is vested in a separate and distinct body, commonly referred to as a board of aldermen or councilmen, while the characteristic feature of the commission form of government is the delegation of
 
 all
 
 of these powers and authority to a single board consisting of a mayor and a limited number of other officers. Or, as succinctly stated in the annotation to be found at 67 A. L. R. 737, the distinctive feature of the commission form of government “so far at least as constitutional questions- are concerned, is the combining in one body of executive and legislative functions, in place of the separation and consequent division of responsibility formerly existing under the old form of mayor and aldermen, or councilmen.”
 

 It is generally conceded that there is no hard and fast rule that can be laid down with reference to defining the commission form of government as it exists throughout the municipalities of this country today, since so many of its features are to be found in these progressive times incorporated in other forms of municipal government that are offshoots of the original commission form of government. Unquestionably, however, if the administrative, executive, and legislative powers are all centered in one compact organization or board, varying in number from three to -seven (there are seven in Grand Rapids, Michigan), then the true test of commission form of government has been met. In other words, this group not only legislates, as do the aldermen under the aldermanic form of government, it also carries out its own legislation and it not dependent upon another officer or body of officers to do so. Mc-Quillin, in his work on “Municipal Corporations,” says: “Doubtless the commission form is, in some measure, a direct result of the conception that municipal government is merely a business question, and therefore, it should be conducted in substantially the same manner as a large business corporation, that is, the conduct of the affairs of the local government should be assimilated as far as practicable to the most efficiently managed private business.” Vol. 2, page 523, Section 9.20. See, also, 19 R.C.L. 745, Section 51; 2 McQuillin 506, Section 9.17.
 

 It is obvious, therefore, that the characteristic feature of the commission form of government is not the election of its commissioners1 at large, or in any other particular manner, but, instead, that all municipal powers be delegated to a single board, in much the same manner as the power to administer a private corporation is given to its board of directors.
 

 
 *137
 
 Speaking of the form of government under which New Orleans was administered after the passage of Act No. 159 of 1912, Dr. R. L. Carleton, assistant professor of government at the Louisiana State University says, in his brochure on “Local Government and Administration in Louisiana
 

 “Several outstanding features of the government of New Orleans warrant considerable attention and criticism.
 

 "Commission government was superimposed upon the mayor council plan of government without changing the old structural features and forms prevailing under the latter system.
 

 “Commission government was not really adopted in its entirety. The Commissioners, individually and collectively, exercise only a porton of the municipal powers. The existence of numerous boards, commissions, and ex-officio bodies prevent commission responsibility, individually or collectively, although there is little question that they exercise enormous power in their personal capacities.
 

 “The board and commission system for the performance or supervision of particular functions was retained in its entirety, notwithstanding the fact that commission goverment is supposed to do away with such bodies and vest full authority and responsibility for the affairs of the city in the commission.”
 

 This form of government was not changed by the amendments of 1936, Act No. 338 and 1946, Act No. 301, and the Bureau of Governmental research in making recommendations for the improvement of the city government of New Orleans in 1946 referred to it as “hybrid.”
 

 The only change Act No. 234 of 1948 makes in the structure of the city government set us by Act No. 159 of 1912, as amended, is that it increases the number of elected public officials from a mayor and four councilmen, all elected at large, to a mayor and seven councilmen, the mayor being elected at large and the councilmen being elected one each from the city’s seven municipal districts. In addition, it increases the number of departments from 5 to 8, so that instead of having only the departments of public affairs, public safety, public finance, public property, and public utilities, the city will be administered by the departments of public affairs, public finance, public safety, public utilities, public streets, public sanitation, public buildings and parks, and institutions and public health. The heads of these various departments, as before, are to be selected from the commissioners elected, the council determining at its first meeting the powers and duties to be embraced in each department, unless otherwise provided in the act.
 

 The provisions of Act No. 159 of 1912 which gave New Orleans its so-called commission form of government are not to be found in any of the amended sections or subsections. Rather, they remain untouched and unchanged in subparagraph (j)
 
 *139
 
 of Section 4 of Act No. 159 of 1912, as amended by Act No. 301 of 1946, which sub-paragraph reads as follows:
 

 “The commission council shall have and possess and shall exercise all executive, legislative and other powers or duties now had and possessed and exercised by the commission council of the city of New Orleans. The commission council shall have the authority to take over, administer, possess and exercise all executive and legislative powers and duties heretofore had, possessed and exercised by all other legislative and administrative officers handling or vesting with any department or subdivision of government within the city of New Orleans, whether herein specifically enumerated or not, it being the intention that all the powers and duties of government in the city of New Orleans or parish of Orleans and the control of all real public property, and all the powers and duties of boards and commissions other than those provided for by the constitution shall be transferred and vested in the city of New Orleans, but the commission council may subsequent to the effective date of this act reestablish and delegate to such boards and commissions duties, obligations and responsibilities that may be set forth in proper ordinances. * * *»
 

 It is clear, therefore, that Act Ño. 234 of 1948 does not, in fact, substitute an aldermanic form of government for the commission form formerly exisiting, since this amending act does not place the legislative powers of the municipality in one body of public officials and the administrative and executive in another officer or group of officers. It is equally clear that neither Act No. 159 of 1912, nor its amending acts of 1936, 1946, and 1948, set up a true commission form of government for the City of New Orleans, but, instead, that these amendments continue, with certain changes, the “hybrid” form that has been in existence since 1912. Consequently, the trial judge erred in his conclusion that because Act No. 234 of 1948 seeks to create an aldermanic form of government its object is broader that its title, rendering it unconstitutional. This act, the title of which indicates it is being enacted for the purpose of amending certain sections of Act No. 159 of 1912, sufficiently notified the legislators and the public generally of the subject matter contained therein and, therefore, in our opinion, it meets the constitutional requirement to be found in Section 16 of Article III of the Constitution of 1921.
 

 The case of Pillans v. Hancock, 203 Ala. 570, 84 So. 757, 759, cited with approval by the trial judge and quoted from extensively by the city in its brief, is clearly not authority for the contention that -the title of Act No. 234 of 1948 is not indicative of its object. In fact, it is destructive of the assertion that the election of councilmen in any.other manner than at large renders the municipal government an aldermanic one.
 

 
 *141
 
 Actually, prior to the enactment of the amending act the Alabama court was considering in the Pillans case, the City of Mobile functioned under a commission form of government, though its councilmen, termed aldermen,
 
 were elected by the voters of the respective wards.
 
 Under the amending act the ward representatives, although termed commissioners and selected from the respective wards,
 
 zvere to be elected by the voters of the city at large.
 
 The contention was made that the amending act was unconstitutional because the legislature had actually substituted an aldermanic form of government in cities having a certain population for the commission form of government, without such change being expressed in the title of the act, and the court upheld this contention for the reason that under the amending act “The governmental functions *
 
 *
 
 * are not consolidated in the entire governing board, the executive functions are given to the mayor, and the legislative functions are given to the so-called commissioners.” During the course of the opinion the Supreme Court of Alabama quotes with approval the following comment from the General Statistics of Cities, 1915, issued by the Department of Commerce, Bureau of Census, of the United States:
 
 "The term ‘commission form of government’ is a generic
 
 one,
 
 and employed in referring to the government of cities administered by a small number of officials exercising both legislative and executive authority.”
 
 (Italics ours.)
 

 As to the other attacks upon the constitutionality of the act, we find that the trial judge in his written reasons for judgment has disposed of all of them except one, not mentioned in the opinion, adversely to the plaintiff’s contention and, we think, correctly so. We therefore adopt his reasons for so ruling, which may be stated to be substantially as follows :
 

 Where an act or a section of an act has been amended a number of times, it is not necessary, in making a subsequent amendment, that the act refer to the inter-' vening amendments in either its title or body. They are considered to be nothing more than surplusage. For this reason, it is unimportant that the body of Act No. 234 of 1948 purports to amend and reenact Sections 9 and 12 of Act No. 159 of 1912 as amended by Act No. 301 of 1946, while the title indicates the amendment and reenactment of these sections as amended by Act No. 338 of 1936. State v. Walters, 135 La. 1070, 66 So. 364; Caddo Parish Police Jury v. Shreveport, 137 La. 1032, 69 So. 828; Board of Penitentiary Commissioners v. Spencer, 159 Ky. 255, 166 S.W. 1017; 59 C.J. 881, Section 464.
 

 Nor is it necessary that a section be repeated in its entirety when only certain paragraphs or subdivisions thereof are being amended and reenacted. It was not necessary, therefore, that Section 4 be reenacted and published as a whole although only subparagraphs (i) and (k) were being amended. Board of Penitentiary
 
 *143
 
 Commissioners v. Spencer, 159 Ky. 255, 166 S.W. 1017; and Edrington v. Payne, 225 Ky. 86, 7 S.W.2d 827.
 

 Since there is no government for the
 
 Parish
 
 of Orleans, the provision of the constitution to be found in Section 3 of Article XIV to the effect that “The Legislature shall provide optional pians for the organization of parochial government, and any parish may change from one plan, so prescribed, to another, when authorized by a majority of the electors voting at an election held for such purpose”, has no application to the case at bar.
 

 The attack levelled at the constitutionality of this act that was not mentioned by the trial judge, i. e., that the provision making the amendments effective at the termination of the present term of the incumbent officials of the city is not indicated in the title of the act, although urged in the city’s answer to this appeal, has apparently been abandoned because it was argued neither orally nor in brief by the city. In any event, there is no merit to this attack. See, Ricks v. Department of State Civil Service, 200 La. 341, 8 So.2d 49.
 

 Having concluded that the act is constitutional, we now pass to the city’s alternative plea, that is, that Act No. 234 of 1948 was repealed or superseded by Act No. 351 of 1948.
 

 It is the city's contention that these two acts, although adopted at the same session of the legislature and purportedly amending and re-enacting Sections 4, 9, and 12 of Act No. 159 of 1912, as amended are irreconcilably in conflict, since the former provides that the executive and administrative functions and duties of the city administration shall be distributed among 8 departments which are created by the act and are headed by a mayor elected at large and
 
 7
 
 commissioners elected from the city’s municipal districts (Section 12) — together with similar corresponding provisions with respect to quorum and requisite voting power (Section 9) and other matters not necessary for a decision in this case — while Section 12 of the latter act provides for only 5 councilmen, all to be elected at large, with corollary differences as to quorum, voting power, etc.; consequently, since Act No. 351 was passed by the house and senate and signed by the governor at a later date than Act No. 234, Act No. 351 has the effect of repealing or superseding Act No. 234.
 

 “Where it is possible to do so, it is the duty of the courts, in the construction of statutes, to harmonize and reconcile laws, and to adopt that construction of a statutory provision which harmonizes and reconciles it with other statutory provisions. A construction of a statute which creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act and will carry out the intention of (the legislative body) Congress.
 
 These rules are particularly applicable to
 
 
 *145
 

 statutes passed at or about the same time, or at the same session of the legislature, since it is not to be presumed that the same body of men would pass conflicting and incongruous acts.”
 
 50 Am.Jur. 367, Section 363. (Italics and brackets ours.)
 

 In the case of State v. Shushan, 206 La. 415, 19 So.2d 185, 190, this court approved and re-adopted “the principle announced by the textwriters that ‘laws are presumed to be passed with deliberation, and with full knowledge of all existing ones on the same subject’” and observed: “In view of this well-recognized legal principle, it is not reasonable to conclude that the Legislature, in enacting a particular statute, intends that it shall be immediately nullified by another statute enacted at the same session. The principle that a repeal by implication is not favored by law is especially applicable as between two statutes passed at the same session of the Legislature. And where two acts relating to the same subject matter are passed at the same legislative session, there is a strong presumption against implied repeal, and they are to be construed together, if possible, so as to reconcile them, giving effect to each, and thereby avoid an implied repeal, rather than to infer that one destroys the other.”
 

 In the first place, it may be noted that even though these acts were passed by the house and senate and signed by the governor at different times, they, nevertheless, under the express constitutional provision to be found in Section 27 of Article III became law at one and the same time, that is, at 12:00 noon on the 20th day after the adjournment of the legislature.
 

 Secondly, we have no difficulty in ascertaining the legislature’s motive for adopting both of these acts and in concluding that they in no way conflict one with the other.
 

 The object of Act No. 351 as expressed in its title is to amend and re-enact the designated sections and subparagraphs of Act No. 159 of 1912. It therefore follows that in order to ascertain just what these changes are we must look to the body of the act. There we find that the only change made in Section 12 is the addition of the italicized portion of the following provision :
 

 “Section 12. Distribution of Powers— The Mayor shall be 'Commissioner of the Department of Public Affairs,
 
 and the present members of the Commission Council of the City of New Orleans who were serving on June 15, 1948, as Commissioner of the Department of Public Safety, Commissioner of the Department of Ptoblic Utilities and Commissioner of the Department of Pttblic Property are hereby respectively assigned to the Departments of which they were the heads on Jume 15, 1948, and the assignments herein made shall not be changed before the expiration of the terms for which the commissioners in office ,on June 15,1948,
 
 were elected. * * * ”
 

 It is perfectly obvious, therefore, that the legislature intended by the enactment
 
 *147
 
 of Act No. 351 of 1948 to “freeze” the commissioners in the offices they were occupying as of June 15, 1948, and to maintain them in such offices until the expiration of their present terms, which will be in 1950.
 

 Act No. 234, on the other hand, was obviously intended to make the changes in the structure of the municipal government heretofore described, which changes are to take effect only at the time the successors to the commissioners who are frozen in their offices by Act No. 351 of 1948 are elected and take office, that is, in 1950.
 

 By giving these two acts this interpretation, we not only give full effect to both, but we also give effect to each and every section and subsection of Act No. 159 of 1912 as amended by Acts Nos. 234 and 351 of 1948.
 

 To hold as contended by the city would result in ridiculous and absurd consequences. By way of illustration, let us concede for the sake of argument that the provisions of Act No. 234 of 1948 that are in conflict with the provisions of Act No. 351 of 1948 have been repealed and superseded by the latter act. This would leave the city in an anomalous situation, for Section 3 of Act No. 159 of 1912, as amended by Act No. 234 of 1948, which section was not r mended in Act No. 351, provides that at the next election of public officials of the city to be held in 1950 the electors of New Orleans shall vote for “a Mayor at large and seven Commission Councilmen, one each of which Councilmen shall be * * elected from each of the seven Municipal Districts of the City of New Orleans as presently constituted by law”, and section 12, as amended by Act No. 351 of 1948, provides that the powers of the city shall be distributed among a Mayor and the four commission councilmen who were heading the departments of public safety, public finance, public utilities, and public property on June 15, 1948.
 

 For the reasons assigned, the judgment appealed from is annulled and set aside and it is now ordered and adjudged and decreed that the plaintiff’s suit be dismissed.